UNITED STATES of America, Plaintiff,

v.

Paublino R. ORTIZ and Jose Avelino
Valenzuela, Defendants.

No. CR 87–818–SVW.

United States District Court,
C.D. California.

June 16, 1989.

**1570**

Thomas K. Buck, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff.

Nicholas A. DeJohn, Kenneth K. Wadas, Nicholas A. DeJohn & Associates, Ltd., Chicago, Ill., Ramon Magana, Law Offices of R. Magana, Modesto, Cal., for defendants.

## ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS EVIDENCE

WILSON, District Judge.

Defendants Paublino R. Ortiz and Jose Avelino Valenzuela ("Defendants") are charged in a three-count indictment with conspiracy to possess with intent to distribute cocaine and marijuana, in violation of 21 U.S.C. § 846 and § 841(a)(1), with possession with intent to distribute approximately 40003.4 grams of cocaine in violation of 21 U.S.C. § 841(a)(1), and with possession with intent to distribute approximately nineteen kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1). Defendants move the Court pursuant to Rule 41 of the Federal Rules of Criminal Procedure to suppress the marijuana and cocaine found in their luggage.

Having considered the parties' papers and submissions and having heard testimony and oral argument, the Court denied Defendants' motion to suppress from the bench on April 25, 1988 and June 13, 1988. The Court at that time explained the basis for its rulings. This memorandum more fully sets forth the Court's analysis.

## STATEMENT OF FACTS

On the evening of September 7, 1987, Lead Ticket Agent Pei Lin Lee ("Lee") was on duty behind the American Airlines ticket counter at Los Angeles International Airport. At approximately 11:00 p.m., Defendants approached the ticket counter. Each man carried a suitcase. Ortiz told Lee that he and his companion held reservations under the name "Valenzuela" for a 12:15 a.m. flight to Chicago on the morning of September 8, 1987. Lee issued two one-way tickets for American Airlines flight 112, for which Ortiz paid a total of $970 in cash. Valenzuela completed name tags for the suitcases while Ortiz paid for the tickets. Lee accepted both suitcases as checked baggage, gave Ortiz the tickets, boarding passes and baggage claims, and directed the men to the departure gate.

In the course of Lee's contact with Defendants, she noticed that Valenzuela was extremely anxious. She observed Valenzuela look nervously at her and at the two suitcases. Lee further observed that Defendants fit within a behavioral profile issued by the Federal Aviation Administration ("FAA") to identify potential hijackers and terrorists.[1] With her suspicions aroused, Lee purposely waited to tag the suitcases until Defendants had left the counter. Had she not suspected terrorist activity, she would have tagged the suitcases and placed them on a conveyor belt behind the ticket counter while Defendants were still at the counter. As Defendants walked away from the counter, Lee saw Valenzuela look back over his shoulder towards the two suitcases which remained at Lee's side.

Based on her observations, Lee believed the bags might contain a bomb, incendiary device or other item or material capable of endangering the passengers and crew of flight 112 to Chicago.[2] So instead of placing the bags on the conveyor belt, which would take the bags to the airplane without any screening for their contents, Lee advised her supervisor that she was going to

---

1. The "hijacker profile" consists of approximately 25 behavioral characteristics associated with terrorists and skyjackers. Details concerning the profile have never been released to the public.

2. Given the volume of drug traffic at Los Angeles International Airport, the Court believes that Lee suspected the possibility that the luggage contained drugs. It would be contrary to human nature for Lee to know of this possibility and not to have it motivate, at least in part, her search of the luggage. The Court believes, however, that Lee was *primarily* looking for devices or substances which could imperil the passengers and crew of flight 112 with respect to the first suitcase she opened. *See infra.*

X-ray the bags.[3] Lee carried the bags to an X-ray machine and upon examining the first suitcase ("first suitcase"), noted that the contents appeared to be two black squares which filled the entire frame of the suitcase. The contents of the second suitcase ("second suitcase") appeared as shades of gray with a black area in the center of the suitcase. Neither bag appeared to resemble "innocent" bags, which typically contain identifiable objects.

Lee decided to open the two suitcases to determine their contents. She took the suitcases to a back room where she could open them without being seen by Defendants. Walter Gibbons, security representative for American Airlines at Los Angeles International Airport, testified that ticket agents are instructed to open bags outside the presence of passengers who have aroused the agent's suspicion since the passenger might possess a hand-held detonator or otherwise act in a dangerous manner. Upon opening the first suitcase, Lee discovered two large, wrapped objects which smelled strongly of marijuana, an odor she recognized. Lee then opened the second suitcase, and found a light, gift-wrapped, soft cardboard box. She shook the box, removed part of the outside wrapping, removed the cardboard top, and tore part of the inside wrapping, whereupon she discovered a white powdery substance later determined to be cocaine.

After opening both bags, Lee contacted airport security and was put in touch with an agent of the Drug Enforcement Administration ("DEA"). The DEA agent instructed Lee to keep the bags on the ground in Los Angeles but allow Defendants to board the plane. Defendants were arrested upon their arrival in Chicago.

**3.** Lee's supervisor, Barbara McMillan, testified that Lee X-rayed the suitcases before talking to her. McMillan, however, characterized Lee's conduct as appropriate and "within policy."

**4.** Congress has directed the FAA to promulgate security measures for air carriers with respect to the screening of passengers and their property for weapons in order to protect against hijacking and sabotage. Air Transportation Security Act of 1974, Pub.L. No. 93–366, 88 Stat.

## DISCUSSION

### I. *Governmental Conduct*

At the time Lee searched Defendants' suitcases, American Airlines maintained a security program as mandated by the FAA and 14 C.F.R. § 108 (1988).[4] American Airline's security program was based on the FAA's standard security program ("SSP"), and was formally approved by the FAA on January 1, 1986. Section VIII of American Airline's Security Program Manual, entitled "Checked Baggage Screening," taken *verbatim* from the SSP, reads as follows:

> *Selected Baggage.* On all domestic flights ... one or more of the below listed procedures shall be followed to prevent or deter the carriage of any explosive or incendiary device in the checked baggage of any passenger meeting the selection criteria established by the FAA:[5]
>
> 1. The passenger has provided to the air carrier evidence of identification meeting its check cashing standards. Any discrepancy between the name as it appears on the ticket and on identification presented by the passenger shall be resolved by the air carrier.
>
> 2. The baggage is not placed aboard the airplane until the passenger has boarded.
>
> 3. The baggage is inspected.

The fact that the FAA not only required domestic air carriers to implement a security program with respect to checked baggage, *see* footnote 4, *supra*, but also provided to the airlines a "Standard Security Program" setting out provisions for searching checked luggage, and ultimately reviewed and approved American Airline's security program (which adopted *verbatim* the FAA's model security measures with

415 (codified as amended in 49 U.S.C.App. § 1356). Section 108 specifically requires each certificate holder to adopt measures to "prevent or deter ... the carriage of any explosive or incendiary in checked baggage." 14 C.F.R. § 108.9 (1988).

**5.** The "selection criteria" referenced in this section of the security manual are the "hijacker profile." *See* footnote 1, *supra*.

respect to checked luggage), constitutes sufficient governmental involvement either "directly as a participant or indirectly as an encourager" to make Lee's X-ray search and subsequent opening of Defendants' first suitcase a governmental search. *United States v. Gumerlock*, 590 F.2d 794, 800 (9th Cir.) (en banc), *cert. denied*, 441 U.S. 948, 99 S.Ct. 2173, 60 L.Ed.2d 1052 (1979); *see generally United States v. Davis*, 482 F.2d 893, 904 (9th Cir.1973) ("It makes no difference that the act of opening appellant's briefcase was accomplished by a 'private' airline employee rather than a 'public' official. The search was part of the overall, nationwide anti-hijacking effort ...").

■ We find, however, that with regard to the second suitcase, Lee was no longer operating as governmental agent when she discovered the cocaine within the suitcase. In reaching this conclusion, we recognize that Lee's initial X-ray inspection of the second suitcase, like her X-ray inspection of the first suitcase, represents a governmental search. *See United States v. Henry*, 615 F.2d 1223, 1227 (9th Cir.1980). However, this second suitcase's X-ray search produced no evidence of cocaine; it revealed only nondescript shades of gray with a black area in the center of the suitcase.

Rather than immediately opening up this suitcase, Lee chose to open the first suitcase whereupon she identified its contents through their smell as marijuana. Once she concluded that Defendants were carrying contraband in the first suitcase, we find that she no longer had reason to suspect Defendants were attempting to hijack the plane or commit an act of sabotage. Defendants' suspicious behavior was immediately explainable as the nervousness of drug traffickers, obviating the need for any continued search of the second suitcase for implements of hijacking or sabotage. We do not believe nor credit Lee's purported explanation that she was searching for liquid PCP or any other potentially hazardous materials when she opened up the second suitcase. Lee understandably was curious about the contents of the second suit-

case after the discovery of marijuana in the first, but the Court is unable to find governmental direction for her search. Instead, the Court views Lee's actions as efforts to satisfy her own curiosity as to whether the second suitcase also contained drugs and not as an effort to discharge an obligation imposed by the FAA-mandated and approved security program.

While Lee then acted as a governmental agent in performing the initial X-ray search of the second suitcase, the Court views the connection between this governmental search that disclosed no presence of cocaine and the subsequent private search that revealed the cocaine as sufficiently attenuated by the intervening events described above to purge any governmental influence or direction from the subsequent private search. *See generally Segura v. United States*, 468 U.S. 796, 804–05, 104 S.Ct. 3380, 3385–86, 82 L.Ed.2d 599 (1984).

In an analogous case, the Ninth Circuit in *United States v. Gumerlock, supra*, addressed the issue of whether the search conducted by United Airlines employees of airfreight was governmental or private in nature. The court held that since the airfreight was not examined as part of a government mandated security program, the air carrier's employees' search constituted a private search; therefore, the search was not subject to the Fourth Amendment. Even where "the private actor is motivated in whole or in part by a unilateral desire to aid in the enforcement of law," 590 F.2d at 800, the *Gumerlock* court found that the search did not fall within the ambit of the Fourth Amendment. Accordingly, we find that Lee's search of the wrapped container found in the second bag is not subject to Fourth Amendment restrictions because it did not transpire as part of a government mandated security program. Lee went beyond the regulations and her *ultra vires* acts are deemed private in nature. *See also United States v. Stevens*, 601 F.2d 1075 (9th Cir.) (when federal regulations authorize a private party to conduct a specific kind of search, and the private party takes the search one step further than the regulations require, the *ultra vires* acts are pure-

ly private in character), *cert. denied,* 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979). The cocaine discovered by Lee in the second suitcase is admissible evidence against Defendants.

## II. *Fourth Amendment Analysis of Search of First Bag*

■ Having found that Lee acted as a governmental agent in her search of the first bag, we must examine whether that search violated the strictures of the Fourth Amendment. As a general rule, the search and seizure of checked baggage is per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause or falls within a few, specially established and well-delineated Fourth Amendment exceptions. *See Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *United States v. Licata,* 761 F.2d 537, 540 (9th Cir.1985).

The exceptions that courts have applied to justify searches of passengers and their carry-on luggage—the administrative search, consent and *Terry* stop-and-frisk exceptions—cannot be used to sanction the warrantless search in this case. Nor are any other exceptions to the warrant requirement applicable here.

### A. *Administrative Search Exception*

■ In *United States v. Davis, supra,* the court approved warrantless airport security checks of all passengers and their carry-on luggage as administrative searches. The court, relying on *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), and *Wyman v. James,* 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), defined an administrative search as a search "conducted as part of a general regulatory scheme in furtherance of an administrative purpose, rather than as part of a criminal investigation to secure evidence of crime." *Davis,* 482 F.2d at 908. Administrative searches satisfied the Fourth Amendment's reasonableness requirement

because "the inspections are neither personal in nature nor aimed at the discovery of evidence of crime, [and therefore] involve a relatively limited invasion of ... privacy." *Camara,* 387 U.S. at 537, 87 S.Ct. at 1735. Since the government urgently needed pre-boarding screening of all passenger and carry-on articles to detect the presence of weapons or explosives in order to prevent airline hijacking, the screening was indiscriminate, and the government had to allow a person the right to refuse a search by electing not to board the aircraft, the *Davis* court upheld these types of warrantless searches.

The search of the first suitcase, a piece of checked luggage, cannot be justified by the same administrative search rationale that permits searches of passengers and carry-on articles. Rather than requiring airlines to search all checked luggage, the FAA has only mandated that airlines deal with the hijacking risk posed by checked luggage on a passenger-by-passenger basis. When a passenger meets the "hijacker profile," his checked luggage becomes suspect and the ticket agent must take one of three steps to eliminate the suspicion. He or she may either demand photo identification to match the passenger to his ticket and baggage stubs; load the luggage on the plane after the suspicious passenger has boarded (apparently suicidal terrorists are not within the contemplation of the FAA); or inspect the baggage.

Because the search of checked luggage is triggered by individual suspicion, it is not sustainable under an administrative search rationale. Unlike the indiscriminate searches in *Davis,* the search here is "personal in nature" and "subject to the discretion of the [agent] in the field" which the Supreme Court has "consistently circumscribed by a requirement that a disinterested party warrant the need to search." *Camara,* 387 U.S. at 532–33, 537, 87 S.Ct. at 1732–33, 1735; *see Davis,* 482 F.2d at 910. When searches become subject to the discretion of non-law enforcement personnel, such as airline agents, the Fourth Amendment can no longer justify the searches as administrative searches. Thus, Lee's

search of the first suitcase was proper only if it can be justified under a consent or *Terry* stop-and-frisk theory or some other exception.

### B. *Consent Exception*

■ Defendants clearly did not *expressly* consent to a search of their baggage. Accordingly, they argue that pursuant to *United States v. Davis, supra,* airport screenings are valid "only if they recognize the right of the person to avoid searches by electing not to board the aircraft." *Davis,* 482 F.2d at 910–11. In *Davis,* the court reasoned that:

> [t]he risk of successful hijacking is not enhanced by allowing a potential passenger to avoid a search on a particular occasion by electing not to fly. *Airport screening searches [of passengers and carry-on items], as carried out in this case and as currently employed nationwide, are not selective.* A prospective passenger who elects not to fly on an earlier flight is, like all other passengers, certain to be subjected to a search before he can board a later flight.

*Id.* at 911 (emphasis added). Thus, Defendants contend that Lee should have requested permission to search their luggage, which would have allowed Defendants, consistent with *Davis,* to elect not to board the aircraft rather than submit to the search.

The Government argues that passengers impliedly give their consent to searches of their checked luggage. The "conditions of carriage" incorporated by reference into Defendants' airline tickets state that *all* baggage is subject to inspection. If passengers do not want their luggage searched, they can simply choose another way to travel. If they choose to proceed "that choice, whether viewed as a relinquishment of an option to leave or an election to submit to the search is essentially a 'consent,' granting the government a license to do what it would otherwise be barred from doing by the Fourth Amendment." *See id.* at 913.

We find the Government's argument without merit. First, although the "condi-

tions of carriage" clearly stated that all baggage is subject to inspection, those conditions were merely incorporated by reference on Defendants' airline tickets. The detailed conditions were only available in pamphlet form upon a passenger's request. No evidence has been presented that Defendants requested this information. Second, the signs at the check-in counter merely stated that passengers "may be asked ... to permit inspection of their checked luggage." Lee never asked Defendants to permit an inspection of their luggage, and it is questionable whether Defendants even understood the warnings in the check-in counter signs because these signs were only printed in English, not Defendants' native language (Spanish). Third, while the law does not as a necessary prerequisite for voluntary consent require Lee to tell Defendants that they have a right to refuse consent, it is one factor that may be considered in determining whether consent was given freely and voluntarily. *See Henry,* 615 F.2d at 1231; *United States v. Miner,* 484 F.2d 1075, 1077 (9th Cir.1973).

Viewing the totality of circumstances, we find that Defendants cannot be held responsible for having impliedly consented to the "conditions of carriage" because they were not adequately placed on notice that an inspection could occur without their permission. Therefore, the Government did not meet its burden of demonstrating meaningful consent. *See Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983) (plurality).

### C. *Terry Stop–and–Frisk Exception*

■ Under the analysis of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a pat down search may be justified by a police officer's fear that a suspicious individual may produce a weapon that would endanger the personal safety of the officer or others nearby. *Id.* at 29, 88 S.Ct. at 1884. The court limited the permissible scope of a *Terry* search to a patting down of the stopped person's outer clothing, for no more was required to detect the presence of weapons that might be available

for immediate use against the officer. *Id.* at 26, 30, 88 S.Ct. at 1882, 1884.

In this case, the Government would have us expand the nature of the *Terry* stop-and-frisk in two ways: (1) no actual stop of the suspected persons would be necessary before a search of their belongings commenced; and (2) the search would not have to be of the suspected persons' outer clothing or even of the containers over which they still maintained control but could include any container affiliated with the suspects. We believe that such an extension of *Terry* goes significantly beyond the analytical underpinnings for the exception. While courts have upheld a limited detention of passengers and their carry-on luggage in order to resolve suspicious behavior, *see, e.g., United States v. Homburg,* 546 F.2d 1350, 1352–54 (9th Cir.1976), *cert. denied,* 431 U.S. 940, 97 S.Ct. 2654, 53 L.Ed.2d 258 (1977), in each case the officers made a stop of the suspected individual and searched carry-on luggage that was within the suspect's immediate control.

Assuming *arguendo* that a *Terry* rationale could support the search of a suspicious person's checked luggage generally, we find that such a rationale would be inappropriate in the instant case. A search of this type must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures. *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879. To make such an assessment, the governmental interests justifying the official intrusion must be identified. Those interests are then weighed against the invasion which the search entailed. *Id.* at 24–26, 88 S.Ct. at 1881–83.

In analyzing the governmental interests, we recognize that the Government has a general interest in protecting passengers from hijacking. This interest would not only surface with regard to the tools of hijacking that a hijacker could hide on his person or in his carry-on luggage (e.g. bombs, guns, or knives) but also with respect to the devices of hijacking that could be secreted in checked luggage (e.g. bombs or incendiary devices). The relevant question, however, is what were the Government's specific concerns with respect to the first suitcase that justified its intrusion and search of that suitcase.

The Government's concerns were triggered when Lee became suspicious of Defendants by virtue of their meeting the "hijacker profile." Specifically, she became wary of Defendants when: (1) they purchased at "the last minute"—11:00 p.m. for a 12:15 a.m. flight; (2) the tickets were purchased for one-way travel from Los Angeles to Chicago; (3) the payment was $970 in cash; and (4) one of the passengers was strangely and overtly nervous. Lee then X-rayed the first bag whose contents appeared as two black squares which filled the entire frame of the suitcase.

The fact that Defendants matched several characteristics in the "hijacker profile" does not automatically constitute reasonable suspicion to search their luggage. *See United States v. Allen,* 349 F.Supp. 749, 752 (N.D.Cal.1972). Recently, the Supreme Court in *United States v. Sokolow,* —— U.S. ——, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), confirmed that while the use of a profile (a drug courier profile in that case) does not detract from the evidentiary significance of the agent's observations, it does not by itself necessarily create reasonable suspicion to search a person. *Id.* 109 S.Ct. at 1587. A court must "require the agent to articulate the factors leading to (his or her) conclusion" in order to assess whether that agent had reasonable suspicion for a *Terry* search. *Id.*

In examining the factors leading to Lee's conclusion that reasonable suspicion existed to believe that the first suitcase contained a threat to passenger safety, we view the factors together, in accordance with *Sokolow. Id.* at 1586. Nevertheless, we find these factors insufficient to supply reasonable suspicion because they "describe a very large category of presumably innocent travelers." *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed. 2d 890 (1980). Purchasing tickets which have already been reserved about one hour and fifteen minutes before the flight is not unusual. Neither are the facts that the tickets were for one-way travel or that one

of the passengers was nervous before the flight. While most travelers probably do not pay for their tickets in cash, this factor even in conjunction with the others, does not establish reasonable suspicion to believe that Defendants were hijackers.

The circumstances in this case more closely resemble the facts of *Reid*,[6] where the court found no reasonable suspicion, than the facts of *Sokolow*[7] or *Royer*,[8] where reasonable suspicion was found. Purchasing two one-way tickets for cash within an hour and a quarter of the flight and acting nervous do not amount to the agglomeration of facts present in either *Sokolow* or *Royer* (e.g. aliases, source city, nervousness, large cash payments for tickets) justifying reasonable suspicion.

Furthermore, in *Sokolow* and *Royer* the agent making the observation was a trained and experienced DEA Agent. In the instant case, Lee, though trained by American Airlines to identify suspicious passengers, does not have the equivalent amount of training and experience in recognizing hijackers that the DEA agents had in *Sokolow* and *Royer*. *See* Declaration of Pei Lin Lee, para. 12 ("I have never received any training or instruction from any law enforcement officer regarding how to detect hijackers, terrorists, or drug traffickers."). Consequently, while the courts in those cases were willing to consider as a factor the considerable training and experience of the agents who made the reasonable suspicion conclusions, we do not believe that Lee's training and experience warrant any type of similar deference.

In contrast to the tenuous and vague governmental interests justifying the search of the first suitcase, the intrusiveness of the search was quite substantial considering the other alternatives Lee had available instead of searching the suitcase. For instance, it would have been reasonable to instruct Defendants to take their baggage to the departure gate for checkin, and thereby force them to either undergo an X–Ray/magnetometer search at the gate or forego travelling. *See Henry, supra*. Such an alternative is attractive because passengers impliedly consent to the screening process by attempting to board a flight with carry-on luggage. *Id.* at 1228. Or it would have been reasonable for Lee to have exercised either of the two other options in the American Airlines Security Program Manual, asking Defendants for photo identification to match the name on the identification with that on the tickets or waiting until Defendants boarded the airplane before placing their suitcase on board.

Alternatively, a hand search of checked luggage would have been reasonable if it were based on stronger evidence suggesting the presence of incendiary devices or bombs, as when a bomb threat has been made. *See, Homburg*, 546 F.2d at 1354; *United States v. Sarkissian*, 841 F.2d 959 (9th Cir.1988).

While we recognize the Government's arduous task in trying to keep the airways free from hijackers, the Fourth Amendment cannot be relaxed in the airport search context to sustain the warrantless and nonconsensual search of Defendants'

---

**6.** In *Reid,* the agent knew at the time of the stop that (1) the defendant flew into Atlanta from Fort Lauderdale, a source city for cocaine; (2) he arrived early in the morning, when police activity was believed to be at a low ebb; (3) he did not check his baggage; and (4) the defendant and his companion appeared to be attempting to hide the fact that they were together. 448 U.S. at 441, 100 S.Ct. at 2754.

**7.** In *Sokolow,* when the agent stopped the defendant he knew, *inter alia,* that the defendant (1) paid $2100 for two airplane tickets from a roll of $20 bills containing nearly twice that amount of cash; (2) traveled under a name that did not match the name under which his telephone

number was listed; (3) flew to Miami, a source city for illicit drugs, staying there for only 48 hours, though a round-trip flight from Honolulu to Miami takes 20 hours; (4) appeared nervous during his trip; and (5) checked none of his luggage. 109 S.Ct. at 1583.

**8.** In *Royer,* the police were aware, *inter alia,* that (1) the defendant was traveling under an assumed name; (2) he paid for his ticket in cash with a number of small bills; (3) he was traveling from Miami to New York; (4) he put only his name and not an address on his checked luggage; and (5) he seemed nervous while walking through Miami airport. 460 U.S. at 493, n. 2, 502, 103 S.Ct. at 1322, n. 2, 1326.

first suitcase. Upon X-raying the bags and discovering suspicious items, the Fourth Amendment required Lee to ask Defendants for consent, to steer them indirectly through a magnetometer (thereby providing them with the choice not to proceed), to ask for photo identification to match with their tickets, to wait until Defendants boarded the plane before putting their luggage on board, or to summon a law enforcement officer. The officer then had the choice of requesting consent to search the luggage, or if the officer believed there to be sufficient indicia of the luggage containing a bomb, incendiary device or contraband, securing a search warrant.[9] This is simply an application of the Fourth Amendment requirement that the search be no more intrusive than necessary. *See Florida v. Royer,* 460 U.S. at 500, 103 S.Ct. at 1325.

Accordingly, we find that the FAA regulation, adopted by the American Airlines Security Program Manual, calling for a warrantless, nonconsensual search of the first suitcase based on Defendants meeting the "hijacker profile" cannot be justified under a *Terry* rationale. Since this regulation is also not supported by an administrative search or consent theory, we conclude that Lee's search of the first suitcase violated the Fourth Amendment.

### III. *Good Faith Exception to the Exclusionary Rule*

■ Despite the unconstitutional search of Defendants' first suitcase, the Government will not be deprived of the fruits of that search if the Court determines that the good faith exception to the exclusionary rule applies in this context. Our analysis focuses on whether the Supreme Court's decision in *Illinois v. Krull,* 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987), extending the good faith exception to searches conducted pursuant to statutes later declared unconstitutional, can be applied to searches conducted pursuant to a FAA regulation (adopted *verbatim* in the

American Airlines Security Program Manual) where the search is later held unconstitutional.

In *Krull,* two police officers conducted a warrantless search of an automobile wrecking yard and discovered state vehicular code violations. The search was authorized by an Illinois statute which was later found to violate the Fourth Amendment. Nevertheless, the evidence obtained from the illegal search was not excluded because the officers objectively and reasonably relied on a presumptively constitutional statute. The court reached this conclusion after balancing the "likelihood of [future unlawful police conduct] deterrence against the costs of withholding reliable information from the truth-seeking process." *Krull,* 107 S.Ct. at 1166.

Analyzing the *Krull* decision, the Ninth Circuit in *United States v. Luk,* 859 F.2d 667 (9th Cir.1988), stated that the *Krull* court noted three factors to determine whether the exclusionary rule would apply:

"(1) whether suppression would affect the group conduct that the exclusionary rule was designed to punish, i.e., police misconduct; (2) the source of the error in the particular case and whether any evidence suggested that the source, e.g., issuing magistrates, was 'inclined to ignore or subvert the Fourth Amendment,' [*Krull,* 107 S.Ct.] at 1166 (citing *United States v. Leon,* 468 U.S. at 897, 916 [104 S.Ct. at 3405, 3415, 82 L.Ed.2d 677 (1984)]); and (3) the basis for believing the exclusion of evidence will have a significant deterrent effect upon the source of the error." *Luk,* 859 F.2d at 675.

### A. *Deterrence of Police Misconduct*

Turning to the first *Krull* factor, deterrence of police misconduct, the Supreme Court has stressed that the primary purpose of the exclusionary rule "is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth

---

**9.** In some cases, the evidence that the luggage contains a bomb or an incendiary device might present an exigent circumstance which would justify a search of the suitcase without a warrant. Such evidence was not produced in this case and we find that no exigent circumstances were present to justify the warrantless search of the first suitcase.

Amendment against unreasonable searches and seizures." *Krull,* 107 S.Ct. at 1165; *United States v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974). The rule is "neither intended nor able to cure the invasion of the defendant's rights which he has already suffered." *Krull,* 107 S.Ct. at 1166; *Leon,* 468 U.S. at 906, 104 S.Ct. at 3411. Rather, the exclusionary rule safeguards Fourth Amendment rights generally through its deterrent effect instead of being a "personal constitutional right of the party aggrieved." *Krull,* 107 S.Ct. at 1166; *Calandra,* 414 U.S. at 348, 94 S.Ct. at 620.

Since deterrence represents the exclusionary rule's chief purpose, a court should suppress evidence "only if it can be said that the law enforcement officer had knowledge, or may be properly charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Krull,* 107 S.Ct. at 1166; *United States v. Peltier,* 422 U.S. 531, 542, 95 S.Ct. 2313, 2320, 45 L.Ed.2d 374 (1975). Where the governmental agent has acted in an objectively reasonable manner,

> excluding the evidence [seized in contravention of the Fourth Amendment] will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that ... the [agent] is acting as a reasonable [agent] would and should act in similar circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty.

*Krull,* 107 S.Ct. at 1166–67; *Leon,* 468 U.S. at 920, 104 S.Ct. at 3419; *Stone v. Powell,* 428 U.S. 465, 540, 96 S.Ct. 3037, 3073, 49 L.Ed.2d 1067 (1976) (White J., dissenting).

In *Leon,* the court found that the exclusionary rule's deterrent objectives were not served when an officer acted in objectively reasonable reliance on a search warrant. In *Krull,* the court concluded that evidence should not be suppressed when officers acted in objectively reasonable reliance on a statute. The approach used in *Leon* and *Krull* can equally be applied in the present case. Deterrence, the exclusionary rule's prime purpose, is not furthered when a

governmental agent acts in objectively reasonable reliance on a FAA regulation.

The same caveat to the good faith exception to the exclusionary rule highlighted in *Leon* and *Krull* is appropriate in this content as well. The governmental agent's reliance on the FAA regulation must be objectively reasonable, not subjectively reasonable. A mere unwarranted belief that a facially unconstitutional regulation was constitutional will not support an agent's good faith allegations. The standard is: would a reasonable agent have known that the regulation violates a defendant's clearly established statutory or constitutional rights. *See Krull,* 107 S.Ct. at 1170 (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Unless the regulation was clearly unconstitutional so that a reasonable agent could not have presumed it valid, we cannot expect an agent to question the judgment of the FAA Administrator.

The question thus turns to whether Lee acted in an objectively reasonable manner while acting as a government agent following the FAA regulation adopted in the American Airlines Security Program Manual calling for an inspection of luggage if a passenger met the hijacker profile. On its face, the regulation stated no language or instructions that would indicate to a reasonable agent that the regulation transgressed the FAA Administrator's statutory power or the Fourth Amendment. Though the regulation presented Lee with three options, the regulation did not indicate that any option was favored over another or that Lee should contact a supervisor or law enforcement agent before deciding which option to take. The facts indicate that Lee did contact her supervisor before opening up the first suitcase and that that supervisor did not make Lee aware of any possible constitutional infirmities in the regulation. Thus, we find that Lee acted in objectively reasonable reliance on the constitutionality of the regulation.

### B. *Inclination of the FAA Administrator to Ignore or Subvert Fourth Amendment*

As an initial matter, the Supreme Court has observed that the exclusionary rule is

aimed at deterring police or their agents' misconduct; the conduct of the FAA Administrator, like that of judicial officers or legislators, is not the "focus of the rule." *Krull,* 107 S.Ct. at 1167; *Leon,* 468 U.S. at 916, 104 S.Ct. at 3417. The inquiry then is whether there is evidence to suggest that the FAA Administrator is "inclined to ignore or subvert the Fourth Amendment." *Id.*

While the FAA Administrator is not a "neutral judicial officer" like the magistrates involved in *Leon,* he more closely parallels the role of the legislators in *Krull* whom the court described as not "adjuncts to the law enforcement team." *Krull,* 107 S.Ct. at 1167; *Leon,* 468 U.S. at 917, 104 S.Ct. at 3417. Like legislators, the Administrator drafts and issues broad regulations for the purpose of assuring "security against acts of criminal violence and aircraft piracy in air transportation and intrastate air transportation." 49 U.S.C.App. 1356. He has to make semiannual reports to the Congress concerning the effectiveness of the screening procedures and has to advise Congress of any regulations at least thirty days in advance of their effective date. *Id.* These regulations are carried out by the individual airlines, as in this case. *See* 14 C.F.R. 108.9 (1988). Consequently, the deliberations of the Administrator are significantly different from the on-the-spot and hurried judgments of airlines agents carrying out the regulations. Moreover, no evidence has been presented to suggest that the FAA Administrator has issued a significant number of regulations violative of the Fourth Amendment. Even the regulation at issue calling for an inspection of luggage could be effectuated constitutionally if, for example, Defendants met the hijacker profile and some type of exigent circumstances were also present to justify the search. Having no basis established from which we could find that the FAA Administrator is inclined to ignore or subvert the Fourth Amendment, we conclude that the FAA Administrator is not so inclined.

## C. *Deterrence of the FAA Administration*

The next inquiry necessitated by *Krull* and *Leon* is whether the exclusion of evidence seized pursuant to an improper search based on an FAA regulation will have a significant deterrent effect on the FAA Administrator prescribing such regulations. *Krull,* 107 S.Ct. at 1168; *Leon,* 468 U.S. at 916, 104 S.Ct. at 3417. We begin by recognizing that the FAA Administrator, like the legislators in *Krull,* issues regulations for "broad, programmatic purposes," (e.g. to promote passenger security) rather than for the purpose of obtaining evidence in a particular case. *Krull,* 107 S.Ct. at 1168. From this starting point, we follow the *Krull* logic in assuming that "the greatest deterrent to the enactment of [regulations by the FAA Administrator that permit unconstitutional searches] is the power of the courts to invalidate such [applications of the regulations]." *Id.* Striking down searches based on such regulations serves two objectives: it informs the FAA Administrator of the need to prescribe a more precise regulation regarding checked luggage screening to comport with the Fourth Amendment; and it affects the admissibility of all evidence obtained subsequent to this Court's ruling. *See id.* An airline agent's good faith allegations could be more rigorously challenged if she relied on the same regulation and the same type of facts which we have held inadequate to sustain a warrantless, nonconsensual search of checked baggage.

Any additional deterrent that might happen by excluding the evidence must be weighed against the "substantial social costs exacted by the exclusionary rule." *Id.* 107 S.Ct. at 1169; *Leon,* 468 U.S. at 907, 104 S.Ct. at 3412. In weighing deterrence against the social costs of excluding the evidence found in the first suitcase, we believe that the deleterious social costs outbalance any positive deterrent effects.[10]

Having found that Lee acted in objectively reasonable reliance on a FAA regulation,

---

**10.** In the same manner that the *Leon* court was not willing to assume that a significant number of magistrates act as "rubber stamps for the police, 468 U.S. at 916, n. 14, 104 S.Ct. at 3417 n. 14, and the *Krull* court was not willing to presuppose that a significant number of legislators

that the FAA Administrator is not inclined to ignore or subvert the Fourth Amendment and that excluding the evidence in the first suitcase would only have a minimal deterrent effect on the FAA Administrator compared to the significant costs of exclusion, we conclude that the application of the exclusionary rule in this context is unjustified.

## CONCLUSION

For the foregoing reasons, we find that Lee acted as a governmental agent in searching the first suitcase. While this warrantless search cannot be justified by the administrative search, consent and *Terry* exceptions, we find that the good faith exception to the exclusionary rule is appropriate. Consequently, we deny Defendants' motion to suppress the marijuana found in the first suitcase.

As for the second suitcase, we hold that Lee's search of this suitcase was private in nature since she was no longer acting pursuant to any governmental direction or encouragement. Therefore, we deny Defendant's motion to suppress the cocaine found in the second suitcase.

IT IS SO ORDERED.

"perform their legislative duties with indifference to the constitutionality of the statutes they enact," 107 S.Ct. at 1168 n. 8, we too do not assume that the FAA Administrator acts without concern for the constitutionality of the regulations he issues. Should future empirical evidence undermine this assumption, the Court's conclusions may be changed accordingly. *See id; Leon,* 468 U.S. at 927–28, 104 S.Ct. at 3422–23.