*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CO-0162

UNITED STATES, APPELLANT,

V.

DAMAIRZIO M. WELLS, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2023-CF3-004555)

(Hon. Errol R. Arthur, Motions Judge)

(Argued June 6, 2024                    Decided August 28, 2025)

*Daniel J. Lenerz*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time, and *Chrisellen R. Kolb*, *John P. Mannarino, D. William Lawrence*, and *Megan E. McFadden*, Assistant United States Attorneys, were on the brief, for appellant.

*Paul Maneri,* Public Defender Service, with whom *Samia Fam*, Public Defender Service, was on the brief, for appellee.

Before EASTERLY, MCLEESE, and DEAHL, *Associate Judges*.

Opinion for the court by *Associate Judge* DEAHL.

Dissenting opinion by *Associate Judge* MCLEESE at page 41.

DEAHL, *Associate Judge*:  This case presents an important question about the

scope of the Fourth Amendment's exclusionary rule: When a law enforcement agent

conducts an unconstitutional search authorized by their agency's regulations, does the exclusionary rule justify suppression of the resulting evidence? Or instead, as the government argues, does the good faith exception apply if the agency reasonably, albeit mistakenly, believed it could constitutionally authorize those searches?

Here are the core facts. The Court Services and Offender Supervision Agency, or CSOSA, supervises the District's convicts on supervised release. For two decades, CSOSA's regulations authorized its agents to impose extended GPS monitoring on its supervisees, and its officers have unilaterally imposed GPS monitoring on thousands of supervisees in that time, including on Damairzio Wells. Those searches routinely violated the Fourth Amendment because CSOSA had no statutory authority to impose GPS monitoring, so they could not be justified under the "special needs" exception to the warrant requirement. *See Davis v. United States*, 306 A.3d 89 (D.C. 2023). Wells's monitoring led to evidence that tied him to an armed robbery. Wells moved to suppress that evidence under the exclusionary rule, while the government argued that the good faith exception applied because CSOSA reasonably believed its GPS monitoring was a constitutional special needs search. The trial court suppressed the evidence and the government now appeals.

We agree with the trial court that suppression was warranted. The exclusionary rule is the principal judicial remedy for assuring compliance with the Fourth Amendment. Its application hinges largely on whether the rule serves its

deterrent function to a degree that outweighs suppression's costs.  The good faith exception applies in those instances where it will not do so, typically where decisionmakers who are not "adjunct law enforcement officer[s]"—like judges or legislatures—affirmatively authorize an unconstitutional search.  *See United States v. Leon*, 468 U.S. 897, 914, 922 (1984) (citation omitted) (judicial warrant authorized search); *(W.G.) Davis v. United States*, 564 U.S. 229, 232 (2011) (binding appellate precedent authorized search); *Illinois v. Krull*, 480 U.S. 340, 360 (1987) (legislation authorized search).  The thinking goes that law enforcement cannot be faulted for relying on those decisionmakers' superior judgments, and those decisionmakers themselves will not feel the exclusionary rule's bite because they have little at stake in particular prosecutions, so that suppression would have little deterrent effect to offset its weighty social costs.

CSOSA is no neutral decisionmaker, however.  "CSOSA is a law enforcement agency." *In re W.M.*, 851 A.2d 431, 455 (D.C. 2004).  Law enforcement agencies and their officers should palpably feel the deterrent effects that underpin the exclusionary rule in a way that judges and legislatures do not.  The good faith exception thus has no application here, regardless of whether CSOSA in some sense reasonably believed its constitutional violations were permissible—in the face of doubt, it should have sought judicial authorization for its searches.  The effects of the exclusionary rule are at their most salutary in deterring systemic constitutional

violations like the ones we confront today. The exclusionary rule thus applies, the good faith exception does not, and we affirm the trial court's suppression ruling.

## I. Factual and Procedural Background

*Wells's GPS monitoring and arrest*

Wells began a term of supervised release in January 2023, imposed as part of his sentence in an earlier Superior Court case. The Superior Court directed Wells to comply with periodic drug testing "at the discretion of CSOSA"—the agency that oversees the District's supervised releasees—as part of his release terms. But neither the Superior Court nor the United States Parole Commission, which is statutorily authorized to set terms of supervised release, D.C. Code § 24-133(c)(2), included GPS monitoring as a condition of Wells's release.

Despite lacking judicial or Parole Commission authorization, Wells's Community Supervision Officer, or CSO, twice required Wells to wear a GPS ankle monitor as an "administrative sanction" in the first several months of his supervision. The CSO claimed compliance with CSOSA's own internal regulations regarding administrative sanctions each time. *See* 28 C.F.R. § 810.3(b)(6) (authorizing sanctions of "[e]lectronic monitoring for a specified period of time"). Wells was first ordered to wear a GPS monitor from March 28 to April 26 as a sanction for a positive marijuana test. He was then placed back on GPS monitoring in early June

because he had submitted urine samples that were deemed "bogus" because they were "over 100 degrees." This second term of GPS monitoring continued for about a month, right up until Wells was arrested on the underlying charges in this case, which we now describe.

In July 2023, Metropolitan Police Department officers investigated a report of an armed robbery. The victim claimed that a man with tattoos had robbed her at gunpoint and taken various items including her iPad, phones, purse, and wallet. One of the first things MPD officers did in response was to crosscheck the time and location of the reported robbery against a GPS database that CSOSA maintains of its supervisees on GPS monitoring, and which it shares with MPD in real time. Wells came back as a GPS "High Hit" based on CSOSA tracking data showing that he was in the locations identified by the victim at the relevant times. MPD officers used this data to track Wells down. A search of Wells and the surrounding area uncovered some of the victim's stolen property and Wells was arrested. After obtaining warrants, officers searched Wells's apartment and car, and they found a gun and ammunition. Wells was then indicted for armed robbery and firearm offenses.

Wells moved to suppress the GPS evidence and its fruits, arguing that under this court's recent opinion in *Davis*, CSOSA's warrantless GPS monitoring violated his Fourth Amendment rights. *See* 306 A.3d at 109. The government acknowledged that the GPS monitoring was unconstitutional under *Davis*, but opposed suppression.

It contended that the good faith exception to the exclusionary rule should apply because the CSO relied upon CSOSA regulations, and those regulations were premised on a reasonable though ultimately mistaken understanding that CSOSA had statutory authority to impose GPS monitoring without judicial or Parole Commission authorization. Some additional context about CSOSA's GPS monitoring program is helpful before diving into the suppression arguments.

*CSOSA's GPS monitoring program and previous challenges to it*

Congress created CSOSA in 1997 through the National Capital Revitalization and Self-Government Improvement Act. Pub. L. No. 105-33, § 11233(a), 111 Stat. 251, 748-51 (1997) (codified at D.C. Code § 24-133). The Act divided authority over the District's supervised releasees between CSOSA and the Parole Commission, giving the Commission "the same authority as is vested in the United States district courts" under 18 U.S.C. § 3583(d)-(i), while granting CSOSA officers "the same powers and authority as are granted by law to United States Probation and Pretrial Officers." *Davis*, 306 A.3d at 99-100 (quoting Pub. L. No. 105-33 § 11233(c)(2), (d)). The upshot of that division of power is that the Parole Commission is empowered to impose release conditions, as district courts do in the federal system, while CSOSA is tasked with enforcing and implementing those conditions, as the Parole Commission does in the federal system. *Id.* at 100-02. It is clear in the federal system that the Parole Commission and its officers cannot

unilaterally impose GPS monitoring absent court approval, and so in *Davis* this court reasoned that it is correspondingly true that CSOSA has no authority to impose GPS monitoring absent judicial or Parole Commission authorization. *Id.*

CSOSA nonetheless promulgated regulations allowing its officers to unilaterally impose "electronic monitoring" as an administrative sanction in 2001. *Id.* at 108; 28 C.F.R. § 810.3(b)(6). That electronic monitoring first took the form of GPS monitoring in 2003. *Davis*, 306 A.3d at 108. CSOSA then issued a formal policy statement establishing procedures for GPS tracking in 2009. CSOSA, *Policy Statement 4008: Global Positioning System (GPS) Tracking of Offenders* (May 7, 2009) [hereinafter GPS Policy Statement]. The policy statement acknowledged that CSOSA uses GPS tracking as "a mechanism for collaborating with the [MPD] and other allied law enforcement agencies to track criminal behavior of designated CSOSA offenders." *Id.* at 1. CSOSA provides MPD direct access to its GPS system, allowing MPD to search location records of all monitored individuals—both historically and in real time—as it investigates crimes. *See United States v. Jackson*, 214 A.3d 464, 470, 482-83 (D.C. 2019) (describing CSOSA's information-sharing procedures); *see also Davis*, 306 A.3d at 94, 108 (same).

Over the years that followed, CSOSA unilaterally subjected tens of thousands of individuals to GPS monitoring without judicial or Parole Commission authorization. In fiscal year 2023 alone—the year of Wells's underlying arrest—

CSOSA tracked 1,958 people through GPS ankle monitors. *See* CSOSA, FY 2025 Budget Request: Summary Statement and Frequently Asked Questions at 25. It shared this location data with MPD pursuant to a longstanding information-sharing agreement designed to "aid in suspect apprehension." *Jackson*, 214 A.3d at 476. That program withstood some distinct legal challenges to it over the years. *Id.* at 486-87 (GPS searches of probationers may be justified short of a warrant under the Fourth Amendment's "special needs" doctrine); *Atchison v. United States*, 257 A.3d 524, 530-31 (D.C. 2021) (same as to supervised releasees). But in *Davis* this court recently confronted a new challenge to the program that we had never previously considered: that CSOSA had no statutory authority to unilaterally impose GPS monitoring absent judicial or Parole Commission approval, so that its GPS monitoring could not be justified as a special needs search. 306 A.3d at 92 (explaining that neither *Jackson* nor *Atchison* resolved that question). That challenge was successful and these searches were deemed unconstitutional. *Id.* at 93.

In *Davis*, we held for the first time that "CSOSA's electronic monitoring regulation is not a reasonable regulation on which a special needs search may be based" because CSOSA had no statutory authority to implement that program, rendering it "unreasonable under the Fourth Amendment." *Id.* at 109-10. That was not a change in our law—a division of this court is not empowered to overrule prior

precedents, *see M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971)—we simply resolved a previously undecided question. We explained that Congress had given the Parole Commission "sole authority to impose or modify conditions of supervised release," while limiting CSOSA to "administrative and supervisory authority." *Davis*, 306 A.3d. at 101-02. While Congress had empowered CSOSA to "develop and operate" intermediate sanctions, we explained that authorization meant that CSOSA was to carry out the release conditions imposed by courts and the Parole Commission, but it could not "unilaterally impose" those conditions itself, particularly those like GPS monitoring that abut constitutional rights. *Id.* at 103. Because warrantless GPS monitoring constitutes a search requiring express authorization from a judge or the Parole Commission, *Davis* held that CSOSA's regulation permitting its officers to unilaterally impose GPS monitoring exceeded its statutory authority, bringing those searches outside the special needs doctrine and rendering them unconstitutional. *Id.* at 109-10 (Within the interests-balancing analysis to determine whether a search was reasonable, the government "cannot have a significant interest in one of its agencies conducting Fourth Amendment searches in excess of the agency's statutory authority.").

*The suppression proceedings and ruling*

Wells moved to suppress the GPS evidence and the physical fruits of his arrest as having resulted from an unconstitutional GPS search in violation of *Davis*. The

government opposed, arguing that Wells's CSO imposed GPS monitoring "in objectively reasonable reliance on existing CSOSA regulations and policy," so that "application of the exclusionary rule is unwarranted." The government furthered, quoting *Krull*, 480 U.S. at 349, that suppression under these circumstances "would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant." Wells countered in reply that "[n]either the Supreme Court, the D.C. Court of Appeals, nor any federal court of appeals has ever held that the good faith exception applies when a law enforcement agency like CSOSA violates the Fourth Amendment pursuant to *its own policies and regulations* to justify a search." And to apply the good faith exception in that context, Wells continued, "would incentivize law enforcement agencies to unilaterally enact policies that allow officers to skirt constitutional requirements in the pursuit of evidence," undermining "[t]he core purpose of the exclusionary rule—to deter law enforcement misconduct."

The trial court agreed with Wells and granted the suppression motion. It reasoned that *Davis* made clear that CSOSA had unconstitutionally subjected Wells to GPS monitoring. As for the government's argument that the good faith exception to the exclusionary rule should nonetheless apply, the court did not "find that the facts here warrant" application of that exception.

The government now appeals.

## II. Analysis

The government does not dispute on appeal that Wells's Fourth Amendment rights were violated when CSOSA subjected him to protracted GPS monitoring; *Davis* makes that conclusion inescapable. 306 A.3d at 93. The only question presented is whether the good faith exception to the Fourth Amendment's exclusionary rule applies to insulate the fruits of that unconstitutional search from suppression. That raises a legal question that this court reviews de novo. *United States v. Lewis*, 147 A.3d 236, 239 (D.C. 2016) (en banc).

### A. The exclusionary rule and the good faith exception

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. When government agents violate the Fourth Amendment, the exclusionary rule typically prohibits the prosecution from using the fruits of unlawful searches as evidence in criminal proceedings as the principal means of disincentivizing unconstitutional searches. *Krull*, 480 U.S. at 347 ("When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search."); *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (The

exclusionary rule is "the principal judicial remedy to deter Fourth Amendment violations.").

Suppression is neither constitutionally mandated nor the inevitable result of a Fourth Amendment violation, however. *See Herring v. United States*, 555 U.S. 135, 141 (2009) ("We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation."). The exclusionary rule is instead a "'prudential' doctrine," *(W.G.) Davis*, 564 U.S. at 236 (quoting *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998)), subject to various exceptions that the government might invoke to avoid suppression. *James v. United States*, 319 A.3d 384, 389 n.8 (D.C. 2024) ("The government may . . . meet its burden by showing that the discovery of the evidence falls within some exception to the exclusionary rule."). Those exceptions include the inevitable discovery, attenuation, and independent source doctrines, to name just a few. *Strieff*, 579 U.S. at 238 (summarizing these three exceptions).

This case concerns only the good faith exception, which applies where law enforcement officers' Fourth Amendment violations were committed in reasonable reliance on some third party's relatively neutral and presumably superior judgment. *See generally Leon*, 468 U.S. at 900 (first endorsing the good faith exception when officers acted "in reasonable reliance on a search warrant issued by a detached and neutral magistrate"). Because officers cannot be blamed for relying on those

superior judgments, and the detached decisionmakers will not themselves feel the exclusionary rule's "bite" when it results in the suppression of evidence in a criminal prosecution, suppression is unwarranted, or so the thinking goes. *See (W.G.) Davis*, 564 U.S. at 237-38 (The exclusionary rule applies only where it "yields[s] appreciable deterrence" that outweighs "the resulting costs.").

Over the past four decades the Supreme Court has recognized several distinct situations where the good faith exception precludes suppression, consistent with the above principles. The Court first endorsed the good faith exception in a case where police officers reasonably relied on a judicial warrant that was later determined to be invalid. *Leon*, 468 U.S. at 922. It has since extended the exception to cases where officers reasonably relied on a statute, later declared unconstitutional, that authorized their search, *Krull*, 480 U.S. at 360; when they reasonably relied on errant computer records maintained by court employees that falsely indicated a suspect had an outstanding arrest warrant that, in fact, had been rescinded, *Arizona v. Evans*, 514 U.S. 1, 4 (1995); and when they reasonably relied on binding appellate precedent, later overturned, affirmatively authorizing their search, *(W.G.) Davis*, 564 U.S. at 232.

The throughline in each of these seminal "good faith" cases is that the police reasonably relied on the judgment of roughly "neutral" third parties—judges, legislators, and court clerks. Those parties are "not adjuncts to the law enforcement

team engaged in . . . ferreting out crime," so that "they have no stake in the outcome of particular criminal prosecutions" and "[t]he threat of exclusion of evidence could not be expected to deter such individuals" in their actions. *Evans*, 514 U.S. at 15 (regarding "court employees" who failed to "inform police officials that a[n arrest] warrant had been quashed"); *see also Leon*, 468 U.S. at 917 ("Judges and magistrates are not adjuncts to the law enforcement team; as neutral judicial officers, they have no stake in the outcome of particular criminal prosecutions."); *Krull*, 480 U.S. at 350-51 ("Although legislators are not 'neutral judicial officers,' as are judges and magistrates . . . neither are they 'adjuncts to the law enforcement team.'" (quoting *Leon*, 468 U.S. at 917)); *(W.G.) Davis*, 564 U.S. at 249 ("[T]he police in [t]his case reasonably relied on binding Circuit precedent . . . [and] scrupulously adhered to governing law."). In each of these cases, (1) the police themselves were "blameless," *(W.G.) Davis*, 564 U.S. at 249, (2) the culpable decisionmaker was roughly "neutral," which is to say, they were neither law enforcement agents nor adjuncts to them, *Evans*, 514 U.S. at 11, 15, and (3) the exclusionary rule thus would not yield appreciable deterrent benefits sufficient to outweigh its social costs.

There is one good faith precedent that does not quite fit the above mold because police negligence was at the root of the Fourth Amendment violation, with no third-party decisionmaker to blame for the violation. That negligence was detached from the resulting constitutional violation in a different respect, though: it

was "attenuated" and "far removed" from it. *Herring*, 555 U.S. at 137, 144. In *Herring*, a law enforcement official "failed to update the [County's] records" to reflect that an arrest warrant for the defendant had been rescinded, and many months later a different officer from another county arrested the individual based on that then-defunct arrest warrant and searched him incident to that arrest. 555 U.S. at 137-38. *Herring* presented roughly the same scenario as *Evans*, except it was a police officer rather than a court clerk who flubbed in failing to update the warrant database. *Id.* at 142 ("*Evans* left unresolved 'whether the evidence should be suppressed if police personnel were responsible for the error.'" (quoting *Evans*, 514 U.S. at 16 n.5)). *Herring* held that a Fourth Amendment violation "that arises from [such] nonrecurring and attenuated negligence" did not trigger the exclusionary rule even though suppression might have been warranted had there been "recurring or systemic negligence" (like if the particular department routinely failed to update its warrant database). *Id.* at 144; *see also Blair v. United States*, 114 A.3d 960, 973-74 (D.C. 2015) (applying good faith exception where "the conduct of whichever [Bureau of Prisons] employee took appellant's blood sample [in 2005] was an act of attenuated negligence" as it related to a DNA "hit" six years later).

That's the rough state of the law, and we now turn to its application.

*B. The good faith exception does not apply to a law enforcement agency's systemic misinterpretation of its legal authority to intrude on Fourth Amendment rights*

To put the above in a nutshell, whether a Fourth Amendment violation triggers exclusion depends largely on whether suppression will yield appreciable deterrent benefits sufficient to outweigh the societal costs of losing evidence in criminal prosecutions. The Supreme Court has held that those deterrent benefits do not outweigh the societal costs and applied the good faith exception in only two related scenarios: (1) where law enforcement was itself blameless by virtue of its reasonable reliance on a third party who could not be expected to feel the deterrent effects of suppression, as in *Leon*, *Krull*, *Evans*, and *(W.G.) Davis*; or (2) when any law enforcement culpability was otherwise detached from the resulting constitutional violation because it was attenuated and far removed from it, and for that reason suppression would not meaningfully deter such errors, as in *Herring*.

The unconstitutional GPS search at issue here fits within neither good faith mold, as we discuss in the first two points below. And there is no third and freestanding good faith category for "reasonable" Fourth Amendment violations—such an exception would swallow the rule whole—as discussed in our concluding third point below.

## 1. CSOSA is not a neutral decisionmaker insulated by the good faith exception

The government argues that the good faith exception applies here because (1) the CSO who imposed GPS monitoring simply followed CSOSA's regulations, and (2) CSOSA is not so motivated by law enforcement objectives that the exclusionary rule will act as a meaningful deterrent against it, at least not when its errors were not egregious. While Wells contests the first point, we accept for the sake of argument that CSOSA's regulations permitted its CSO to impose GPS monitoring on Wells.[1] So the question becomes whether the exclusionary rule would adequately serve its deterrent purposes by disincentivizing CSOSA and similarly situated law enforcement agencies from implementing unconstitutional regulations and policies.

The government argues the exclusionary rule would not meaningfully serve that core function here. It stresses that the "most important[]" point to its invocation of the good faith exception is that CSOSA—like a judge, legislator, or court

---

[1] Wells argues that his "bogus" urine samples were no basis to impose GPS monitoring on him even under CSOSA's regulations. Save for that argument, which we do not resolve today, Wells does not dispute that the exclusionary rule would not meaningfully disincentivize individual CSOs from following CSOSA's regulations. For good reason: When an individual officer is merely following his own agency's policies, they generally cannot be expected to second guess them, so the proper unit of the exclusionary rule analysis must shift to the agency itself and the extent to which the exclusionary rule is needed to disincentivize it from implementing policies that authorize unconstitutional searches.

employee—"has no stake in the outcome of [any] particular criminal prosecution" so that the exclusionary rule will not meaningfully deter its non-deliberate Fourth Amendment violations. Put another way, the government seeks to lump CSOSA in with neutral decisionmakers that do not feel the exclusionary rule's bite because they are not part of "the law enforcement team engaged in . . . ferreting out crime." *See Evans*, 514 U.S. at 14-15 ("[T]he exclusionary rule was historically designed as a means of deterring police misconduct, not mistakes by court employees."); *see also Leon*, 468 U.S. at 916 ("[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates."); *Krull*, 480 U.S. at 350 ("Penalizing the officer for the legislature's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." (quoting *Leon*, 468 U.S. at 921)); *(W.G.) Davis*, 564 U.S. at 241 (The exclusionary rule should not "penalize the officer for the appellate judges' error." (quoting *Krull*, 480 U.S. at 350)).

We are unpersuaded. What differentiates CSOSA from all of the third-party actors that the good faith exception has been applied to is that CSOSA, at its core, "is a law enforcement agency." *In re W.M.*, 851 A.2d at 455. This is not some vacuous label eliding CSOSA's general disinterest in criminal prosecutions, as the government suggests. CSOSA in very real and tangible ways has a hand-in-glove relationship with MPD, the District's central police force. CSOSA promotes how

its CSOs "often work nights and weekends assisting D.C. MPD and other law enforcement partners in special crime initiatives," CSOSA, *Strategic Plan: Fiscal Years 2022-2026*, at 22, and it champions its "vital role assisting with the combating of violent crime in the District of Columbia," MPD Press Release, *Operation Trident Targets Violent Offenders* (Oct. 5, 2023) (quoting CSOSA Director Richard Tischner). It conducts thousands of home visits of supervisees each year, known as "accountability tours," which are "conducted jointly" by a CSO and "a D.C. MPD officer." CSOSA, *Congressional Budget Justification: Fiscal Year 2025*, at 58, 65 (Mar. 11, 2024).

Most relevant here, CSOSA's GPS monitoring database was created and is maintained with a law enforcement purpose in mind. CSOSA trains MPD officers and other law enforcement partners on how to access and search its GPS monitoring database in real time precisely because it is such a powerful investigatory tool for crime detection and law enforcement. GPS Policy Statement, *supra*, at 2. As we have previously put it, CSOSA "collects . . . GPS tracking data *with a law enforcement objective*" and shares this data with MPD "in furtherance of their mutual law enforcement objectives." *Jackson*, 214 A.3d at 486 (emphasis added); *id.* at 476 (CSOSA shares its GPS database with MPD for the express purpose of "aid[ing] in suspect apprehension."); GPS Policy Statement, *supra*, at 1 (CSOSA shares GPS data with "allied law enforcement agencies to track criminal behavior.").

Through its GPS monitoring database, CSOSA provides MPD with direct access to an incredibly powerful investigatory tool. That is not some unforeseen collateral consequence of its GPS monitoring program: it is its raison d'être.

The government counters that CSOSA's central mission is not to root out crime but to "reform convicted offenders," *Jackson*, 214 A.3d at 473, with a focus on "rehabilitation," *Atchison*, 257 A.3d at 531; *see also Scott*, 524 U.S. at 368 ("Parole agents, in contrast to police officers, are not 'engaged in the often competitive enterprise of ferreting out crime.'" (quoting *Leon*, 468 U.S. at 914)).[2] But agencies, like people, are not singularly focused automatons. We accept that offender rehabilitation is a meaningful part of CSOSA's mission, but that is surely true of classic police forces and their officers as well—they will often have the dual and complementary objectives of ferreting out crime and of rehabilitating offenders so that they do not reoffend. So to whatever extent CSOSA is motivated by rehabilitating its supervisees, that does not undermine its strong and self-professed

---

[2] While the government relies upon this quoted language from *Scott*, that case held only that the exclusionary rule does not apply at parole revocation hearings. 524 U.S. at 364. Critically, *Scott* took it as a given—and as bolstering its conclusion that the suppression of evidence at revocation hearings was not a necessary deterrent—that the evidence recovered by parole officers via unconstitutional searches "could be suppressed in a criminal trial." *Id.* at 369. That case thus supports the exclusionary rule's application in this case, rather than its circumvention.

interests in crime detection, and it thus does not dilute the deterrent effects that the exclusionary rule will have on it.[3]

This case thus does not resemble *Leon*, *Krull*, *Evans*, or *(W.G.) Davis* because CSOSA was not deferring to any neutral third party's superior judgment when authorizing unconstitutional GPS searches. It exercised only its own mistaken judgment that it was statutorily authorized to unilaterally impose GPS monitoring, when in fact it was not, and no neutral third party had assured it otherwise. The fact that neither this court nor Congress intervened to put a stop to that GPS program earlier cannot be understood as their sub silentio authorization of the program—they were never asked to examine whether CSOSA had the statutory authority that it claimed. Neither the Supreme Court nor any other appellate court has ever extended the good faith exception to cover an officer's reliance on law enforcement agency

---

[3] The dissent argues that "almost everything" the Supreme Court said about legislatures in *Krull* applies equally to CSOSA's regulations. *Post* at 64-65. Maybe so, but the one glaring difference between them is the thing that matters most to the exclusionary rule analysis: the driving force behind *Krull* was that legislatures are not "adjuncts to the law enforcement team," so that the exclusionary rule will not act as an effective deterrent against them, 480 U.S. at 350-51, and the dissent agrees the same cannot be said for CSOSA. *Post* at 63. So whatever commonalities CSOSA and legislatures share are trivialities in light of this core difference between them.

regulations,[4] and it would not make any sense to do so. It would gut the exclusionary rule to take that leap.

Law enforcement's strongest institutional incentives lie in rooting out crime, and its judgments invariably skew in favor of those incentives when they run up against individual rights like those protected by the Fourth Amendment. The exclusionary rule acts as a critical counterweight so that law enforcement's decisions do not tilt so heavily in favor of their own interests, and to ensure it gives adequate weight to the strong Fourth Amendment interests on the other side. *See United States*

---

[4] The United States floats one unpublished order from a federal magistrate judge that, while not from an appellate court, might otherwise fit the bill. *See United States v. France*, No. 19-cr-0103, 2020 WL 5229040, at \*5-6 (N.D. Ga. May 4, 2020). In *France*, the judge concluded that the good faith exception applied to insulate Customs and Border Patrol officers' searches of packages because they "acted on the basis of a [customs] regulation that permitted the warrantless opening of priority mail delivered from the continental United States to the Virgin Islands." *Id.* at \*5. But that judge's cursory good faith analysis did not examine whether Customs and Border Patrol is a law enforcement agency—we have no view on that— nor did he give any consideration to whether the exclusionary rule could be expected to deter it. The judge's principal reasoning was that there was no constitutional violation at all—that the search fell under the border-search exception to the warrant requirement, *id.* at \*3-5—with the good faith discussion a cursory throwaway. While the government here cites other trial court cases concluding that reliance on official regulations merited application of the good faith exception, each of those cases involved non-law-enforcement actors relying on non-law-enforcement regulations. They are thus far afield and fit far more comfortably within the good faith exception's lenity for neutral third-party decisionmakers who are not adjuncts to law enforcement. *See, e.g.*, *United States v. Kolokouris*, No. 12-CR-6015, 2015 WL 7176364, at \*12-13 (W.D.N.Y. Nov. 13, 2015) (asbestos inspector relying on state Department of Labor regulations relating to asbestos removal); *United States v. Ortiz*, 714 F. Supp. 1569, 1579 (C.D. Cal. 1989) (search by American Airlines employee per Federal Aviation Administration regulation).

*v. Sparks*, 711 F.3d 58, 64 (1st Cir. 2013) ("[W]here judicial precedent does not clearly authorize a particular practice, suppression has deterrent value because it creates an incentive to err on the side of constitutional behavior."). If law enforcement agencies can insulate themselves from suppression by passing regulations approving constitutionally questionable searches, the Fourth Amendment is toast—that would only incentivize law enforcement to push the Fourth Amendment envelope in systemic ways, as occurred here. *Cf. Krull*, 480 U.S. at 366 (O'Connor, J., dissenting) ("Providing legislatures a grace period during which the police may freely perform unreasonable searches in order to convict those who might have otherwise escaped creates a positive incentive to promulgate unconstitutional laws.").

The exclusionary rule is an especially salutary and necessary tool when it acts as a counterweight to the policy-level decisions at issue here, where CSOSA gave to its own agents sweeping authority to unilaterally (and unconstitutionally) impose GPS monitoring on tens of thousands of supervisees over the years. *Herring*, 555 U.S. at 144, 147 (even "attenuated negligence" that is "far removed" from the constitutional intrusion might warrant suppression if "systemic"). This very case illustrates the point. There has been and there apparently will be no real downside to CSOSA's innumerable constitutional violations over the decades, save for the exclusionary rule's potential application; those violations were all upside in

advancing its law enforcement interests if suppression is removed as a counterweight. CSOSA, as a federal agency, is absolutely immune from civil liability for constitutional torts. *F.D.I.C. v. Meyer*, 510 U.S. 471, 475, 477-78 (1994). Its individual officers are entitled to qualified immunity for any debatable constitutional violations, so even that indirect disincentive flowing from its officers is off the table for all but the most egregious violations. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) ("The doctrine of qualified immunity shields officials from civil liability" unless it "is 'sufficiently clear that every reasonable official would have understood that what he is doing violates [a constitutional] right.'" (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012))).

The government counters that CSOSA's regulations are subjected to other checks, inapplicable to an officer's hurried judgment on the street. For instance, those regulations go through the notice-and-comment process, and CSOSA is subject to some congressional oversight. But this very case demonstrates why those are ineffectual constraints. Agencies often "seek[] to squeeze [their] policy goals into ill-fitting statutory authorizations and restraints," with notice-and-comment periods providing little backstop against that. Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2150 (2016) (reviewing Robert A. Katzmann, *Judging Statutes* (2014)); *see also* David S. Tatel, *The Administrative Process and the Rule of Environmental Law*, 34 Harv. Envtl. L. Rev. 1, 2 (2010)

("[I]t looks for all the world like agencies choose their policy first and then later seek to defend its legality."); Ronald A. Cass, *Rulemaking Then and Now: From Management to Lawmaking*, 28 Geo. Mason L. Rev. 683, 697 (2021) (Notice-and-comment procedures are "modest almost to the point of being merely precatory."). Here, for example, CSOSA had implemented its electronic monitoring under an interim rule for years as the initial notice-and-comment period played out, and it received only one comment during that period. While the government takes that as evidence that CSOSA's regulations were generally unobjectionable, it is instead more a byproduct of the opacity of CSOSA's regulation, which never highlighted its use of GPS monitoring in particular. The regulations contemplated "electronic monitoring" at a time when that technology allowed CSOSA to monitor only whether supervisees were at home during designated curfew hours—not the far more invasive GPS monitoring that now tracks and logs their every movement throughout the day.

And "congressional oversight of administrative decisionmaking is often limited, infrequent, and ad hoc rather than systematic." Nina A. Mendelson, *Foreword: Rulemaking, Democracy, and Torrents of E-Mail*, 79 Geo. Wash. L. Rev. 1343, 1355 (2011). The congressional overseers here never even appeared to question (much less scrutinize) CSOSA's authority to unilaterally put its supervisees on GPS monitoring, not even after the Supreme Court first made clear such GPS

monitoring constituted a Fourth Amendment "search." *See United States v. Jones*, 565 U.S. 400, 404 (2012); *but see United States v. Knotts*, 460 U.S. 276, 285 (1983) (no search where police used "beeper" or "radio transmitter" to track a person's movements on public streets). Neither CSOSA nor its officers have suffered any tangible consequences for its routine constitutional violations in the aftermath of this court's *Davis* opinion either. The only legislative response to this court highlighting the lack of any statutory authority for CSOSA's GPS monitoring program was the D.C. Council statutorily authorizing it to continue. *See* Secure DC Omnibus Amendment Act of 2024, D.C. Act 25-411, § 26, 71 D.C. Reg. 2725 (Mar. 15, 2024) (amending D.C. Code § 24-133 to permit CSOSA to unilaterally impose "GPS monitoring"). That's not even a slap on the wrist—it's a pat on the back.

While the exclusionary rule would thus serve as a potent and necessary deterrent to any future CSOSA violations, its costs—while surely "heavy," *(W.G.) Davis*, 564 U.S. at 237—are less weighty than the individual rights on the other side of the scale and the interests in deterring CSOSA's systemic violations from recurring. When gauging the deterrent value of exclusion, it is helpful to remember that for each adjudicated Fourth Amendment violation, there are many others like it that will never receive judicial scrutiny, but are just as worthy of deterring. *See Elkins v. United States*, 364 U.S. 206, 217-18 (1960) ("[T]here are[] many unlawful searches . . . which turn up nothing incriminating, . . . about which courts do nothing,

and about which we never hear," leaving "invasion of the personal liberty of the innocent" without "practical redress." (quoting *Brinegar v. United States*, 338 U.S. 160, 181 (1949) (Jackson, J., dissenting))). This case exemplifies the point: CSOSA first began unilaterally placing supervisees on GPS monitoring more than twenty years ago, with the vast majority of those constitutional infractions presumably yielding no valuable prosecution evidence, so there was not even a threat of anything to exclude in those instances. And for twenty years that unlawful conduct continued unabated, until this court's opinion in *Davis* made clear what the statutory scheme already made clear enough—that CSOSA had no statutory authority for unilaterally imposing GPS monitoring so that its decades of searches were unconstitutional. *Davis*, 306 A.3d at 110-11.

So what law enforcement has gotten thus far as a result of CSOSA's systemic constitutional violations is decades' worth of one of the most powerful investigatory tools around, deployed at its unchecked discretion. *See Jones*, 565 U.S. at 416 (Sotomayor, J., concurring) (describing how GPS monitoring "mak[es] available at a relatively low cost . . . a substantial quantum of intimate information about any person whom the government . . . chooses to track"). The exclusionary rule stands as the only meaningful counterweight—i.e., the "last resort," *(W.G.) Davis*, 564 U.S. at 237 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006))—against that history of systemic violations repeating itself. There will be no remedy at all for the vast

majority of CSOSA's violations and little to offset the innumerable law enforcement benefits it has yielded if the "bitter pill" of the exclusionary rule does not apply here.[5] *Id.*

We thus conclude that the good faith exception's grace for law enforcement's reasonable reliance on neutral decisionmakers has no application here. CSOSA is not a neutral decisionmaker, but acts with express and pronounced law enforcement objectives, so that it can be expected to feel the exclusionary rule's bite. That bite is most necessary in deterring systemic constitutional violations like the ones it authorized. Which is to say, "the deterrence benefits of suppression . . . outweigh its heavy costs" here. *Id.*

---

[5] The parties have pointed us to only one other pending case that also raises a suppression claim stemming from CSOSA's GPS monitoring, and it is the only case we are aware of likely to be directly impacted by today's decision: *Johnson v. United States*, No. 24-CF-925 (in briefing). When pressed at oral argument on how many other such cases are pending in this court or the trial court, the government surmised "more than a handful," but to date has offered nothing more concrete than that and no other example. Given that this court decided *Davis* two years ago, we would expect that any colorable challenges to CSOSA's unauthorized GPS searches would have arisen at least in the trial court by now, and yet this case and *Johnson* stand as the only two cases that we are aware of where CSOSA might feel the exclusionary rule's bite. *Davis* itself could be considered a potential third case but for the fact that Davis had served his entire prison sentence before that opinion issued. So there was little societal cost in the exclusionary rule's application, which the government did not contest, in that case. In any event, if we assume the seeming counterfactual that dozens of more cases are in the pipeline where our decision today will result in suppression rather than absolution for CSOSA's constitutional violations, that would not alter our conclusion that exclusion will have paid its way by disincentivizing these systemic constitutional violations from recurring.

## 2. CSOSA's regulations were not attenuated and far removed from this violation

Recall that there is one instance where the good faith exception might apply to law enforcement's own errors that are unattributable to its blameless reliance on third-party decisionmakers. The textbook example comes from *Herring*, in which a police officer made an isolated error in failing to update a warrant database and a different officer from another county then relied on the errant entry and arrested somebody for whom, contrary to the database, there was no outstanding arrest warrant. 555 U.S. at 140-48. In that instance, where the arresting officer "did nothing improper," *id.* at 140, and the careless officer's data-entry error was singular and distantly "attenuated" from the arrest and search, *id.* at 144, exclusion was not warranted. The good faith exception applied instead because the only law enforcement culpability was "isolated," "nonrecurring," and "far removed" from the constitutional violations at issue. *Id.* at 137, 144.

CSOSA's constitutionally infirm regulations were none of those things, and we do not understand the government to argue otherwise. CSOSA's regulations expressly authorized its CSOs to unilaterally impose GPS monitoring in countless cases, so that its errors were not "isolated" and "nonrecurring" but systemic. And those infirm regulations were not "attenuated" and "far removed" from the recovery of the incriminating evidence against Wells, but directly and predictably led to it, as they led to the recovery of criminal evidence in countless other cases. The good

faith exception's grace for *Herring*-type law enforcement errors thus affords CSOSA no shelter either.

### 3. There is no freestanding good faith exception for reasonable Fourth Amendment violations

The government's final argument is that, in the limited circumstances of this case, where an agency's regulations approve constitutionally infirm searches, the good faith exception applies so long as the agency might have reasonably thought those regulations were constitutionally permitted. The premises of the argument are as follows. There was a fair argument before *Davis* that the statute authorizing CSOSA to "develop and operate intermediate sanctions" permitted its widespread GPS monitoring program. While it is now undisputed that it did not, that was once a fairly debatable point given that (1) the dissenting judge in *Davis* opined that CSOSA was statutorily authorized to unilaterally impose GPS monitoring so that its searches were constitutional, 306 A.3d at 112 (Thompson, J., dissenting), and (2) this court had twice rejected distinct Fourth Amendment challenges to CSOSA's GPS program prior to *Davis* and, while neither case examined whether any statutory authority permitted those searches, neither did this court call out any obvious constitutional problem, *see Jackson*, 214 A.3d at 467; *Atchison*, 257 A.3d at 530. Because the constitutionality of these searches was a fairly debatable question prior

to *Davis*, CSOSA "lack[ed] the culpability required to justify the harsh sanction of exclusion," *(W.G.) Davis*, 564 U.S. at 239, or so the argument goes.

The government supports this argument with some pretty forceful language from two of the Supreme Court's recent good faith cases—*Herring* and *(W.G.) Davis*. In *Herring*, the Court said, for example that "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence," not officers who acted in an "objectively reasonable" way. 555 U.S. at 144, 146. And in *(W.G.) Davis*, the Court similarly said that "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful . . . exclusion cannot 'pay its way.'" 564 U.S. at 238 (quoting *Leon*, 468 U.S. at 919, 908, n.6). Based largely on that language, the government argues that CSOSA's regulations were objectively reasonable, even if ultimately unconstitutional, so that the good faith exception applies.

We disagree. The government conflates two very different things: whether a law enforcement agency reasonably believes it can lawfully intrude into Fourth Amendment rights, on the one hand, and the separate question whether it can reasonably act on that unilateral judgment, on the other.

On the threshold Fourth Amendment question of whether it was reasonable for CSOSA to act on its own unilateral and ultimately mistaken judgment, this court

has already answered that question in the negative. *Davis* expressly holds that "this regulatory scheme allowing CSOSA to unilaterally order GPS searches . . . is unreasonable under the Fourth Amendment." 306 A.3d at 109. If those searches were reasonable, they would not have run afoul of the Fourth Amendment in the first place. *See Heien v. North Carolina*, 574 U.S. 54, 66-67 (2014) ("The Fourth Amendment tolerates . . . reasonable mistakes" including "mistakes of law" in the threshold determination of whether any violation occurred).[6]

That conclusion is not altered, and the good faith exception does not kick in, even if we accept that CSOSA might have reasonably thought pre-*Davis* that it did have statutory authorization to unilaterally implement GPS monitoring as an "intermediate sanction"—it was still unreasonable for CSOSA to act on that

---

[6] The dissent at one point suggests that *Davis* does not foreclose the "*Heien* argument" that CSOSA's GPS regulation complied with the Fourth Amendment because that regulation "rested on a reasonable mistake of law." *Post* at 58-59. Maybe that's right in terms of what *Davis* did and did not decide, but it is neither here nor there where the government now concedes that *Davis* answers the threshold question that CSOSA did in fact violate Wells's Fourth Amendment rights and acted "unreasonabl[y]" in doing so. 306 A.3d at 109. If *Davis* left some room for an argument that CSOSA did not in fact violate its supervisees' Fourth Amendment rights because it did not expressly consider a *Heien* argument that was not raised by the government, then that is an issue this court might wish to consider in a case where the government is actually disputing that a Fourth Amendment violation occurred. But, as explained above, the government concedes the constitutional violation here.

unilateral and mistaken judgment.[7]   That type of deliberate, self-serving, law enforcement guesswork is exactly what the Fourth Amendment's warrant requirement exists to thwart.  In the face of what was at least grievous uncertainty about its authority to unilaterally authorize these GPS searches, which no neutral decisionmaker had assured CSOSA it could undertake, CSOSA should have taken the familiar step of seeking either Parole Commission or judicial modification of Wells's release conditions to include GPS monitoring—the type of judicial authorization that the Fourth Amendment's warrant requirement is meant to ensure. *See Richardson v. United States*, 927 A.2d 1137, 1144 n.13 (D.C. 2007) (CSOSA "is in charge of day-to-day monitoring," but the "setting of initial conditions of probation," and "the modification of those conditions," remain "within the discretion of the court . . . and the U.S. Parole Commission."); D.C. Code § 24.403.01(b)(6). There were no exigent circumstances precluding it from doing so, and suppression

---

[7] It should go without saying that reasonably believing one can do something does not make it reasonable to do it. To illustrate the point, consider a hiker who reasonably believes she can jump across a ten-foot gorge, with a steep and fatal drop awaiting her if she fails.  Let's say she's somewhat athletic and in fact has something like a 50% chance of making the jump, though she might alternatively walk to a nearby footbridge and cross more safely.  It is entirely reasonable for our hiker to believe she can make the jump, and yet she would clearly be reckless and extremely unreasonable to attempt it.  CSOSA found itself in a similar circumstance.  It was not irrational for it to think that it was permitted to unilaterally impose GPS monitoring.  But to so cavalierly gamble with the Fourth Amendment rights of thousands of individuals just because CSOSA had a plausible argument that it could lawfully do so, rather than simply seeking judicial pre-authorization on a case-by-case basis, or express statutory authorization more globally, was quite culpable.

would have been off the table had CSOSA received such judicial pre-authorization. It was not in any sense reasonable for CSOSA to repeatedly roll the dice with countless individuals' constitutional liberties based on its own self-serving, merely debatable, but ultimately incorrect reading of a statute. That is true whether its underlying legal mistake was reasonable or not.

That leaves our dissenting colleague's more ambitious position, which even the government will not go so far as to embrace, that the good faith exception applies whenever officers could have reasonably believed that their conduct was lawful. Under our colleague's view, it is mere happenstance, irrelevant to understanding the proper scope of the good faith exception, that every single one of the Supreme Court's good faith cases involved officer reliance on some detached third-party judgment.[8] Those cases instead stand for the far more sweeping proposition, unmoored from the common nucleus of facts that they each share, that unreasonable searches and seizures conducted in violation of the Fourth Amendment do not merit

---

[8] As we have explained above, *Herring* is no exception to that rule. While that case involved law enforcement's own negligence, so that the decisionmaker was not a detached third party, the judgement itself was detached from the resulting constitutional violation as it was "attenuated" and "far removed" from it. *Herring*, 555 U.S. at 137, 144. That is, the negligent officer had no part in the decision to seize and search the suspect. Whereas here, CSOSA relied only on its own judgment, and that judgment was to directly authorize the unconstitutional searches.

suppression whenever it was "objectively reasonable" for law enforcement to believe their intrusions complied with the Fourth Amendment.

Adopting that view would mark a sea change in exclusionary rule jurisprudence that would roughly align it with qualified immunity jurisprudence, with suppression applying to only the most egregious police misconduct where no reasonable officer could have thought it was lawful.[9] *See generally Mullenix*, 577 U.S. at 12 (Qualified immunity insulates officers from suit unless "existing precedent . . . placed the statutory or constitutional question beyond debate."). We acknowledge that there is language in *Herring* and *(W.G.) Davis* that could be read to portend such a cataclysmic shift in the law, which no jurisdiction has adopted in the roughly fifteen years since those decisions. But this court has already quite wisely rejected such a sweeping interpretation of those cases.

Our precedents interpreting *Herring* and *(W.G.) Davis* have already held that the good faith exception does not apply where an appellate precedent only arguably countenances law enforcement conduct—the precedent must affirmatively and clearly do so for the good faith exception to apply. *See Jones v. United States*, 168

---

[9] Our dissenting colleague seeks to distance his position from the qualified immunity standard, but at the same time declines to "delve into a precise definition of" what "objective reasonableness" means under his view. *Post* at 68. He has not pointed to any material difference between his view and the qualified immunity standard and so far as we can tell, they are one and the same.

A.3d 703, 720 n.33 (D.C. 2017) ("[T]he good-faith exception for police reliance on binding judicial precedent would not apply where 'the precedent is distinguishable.'" (quoting *(W.G.) Davis*, 564 U.S. at 248)); *United States v. Debruhl*, 38 A.3d 293, 297 (D.C. 2012) (good faith exception applies only where "binding appellate precedent" provides "explicit protection or 'cover'" to the officer's conduct). It follows that the good faith exception does not apply simply because legislation *arguably* authorizes a police search; it needs to actually and affirmatively do so, and it didn't here. *See* 4 Wayne R. LaFave, *Search and Seizure* § 1.3(h) (6th ed. 2024) ("*Krull* is inapplicable when the officer [himself] merely claims that he made a reasonable but mistaken interpretation of the scope of his search authority under a certain statute.").

The federal courts of appeals are in accord that the more sweeping reading of *Herring* and *(W.G.) Davis*, applying the good faith exception to constitutional violations that were fairly debatable, "cannot be the law." *United States v. Sheehan*, 70 F.4th 36, 55 (1st Cir. 2023); *id.* at 54-55 ("We do not read *Herring* to require an additional or individualized assessment of the deliberateness and culpability of police conduct. . . . To hold otherwise would expand the good-faith exception to swallow, in a single gulp, the warrant requirement itself."); *United States v. Camou*, 773 F.3d 932, 945 & n.3 (9th Cir. 2014) (holding that an officer's recklessness or deliberateness is a condition of exclusion only when, as in *Herring*, their acts were

attenuated from and not "directly" responsible for the constitutional violation); *United States v. Lazar*, 604 F.3d 230, 237-38 & n.6 (6th Cir. 2010) (rejecting argument that *Herring* "greatly expanded the Good Faith" exception).

Our dissenting colleague cites to several supposed counterexamples: (1) a Fifth Circuit case that predates the Supreme Court's initial adoption of a good faith exception in *Leon*, and so that case says nothing about how to best interpret those precedents, *United States v. Williams*, 622 F.2d 830 (5th Cir. 1980) (en banc); (2) a Second Circuit case that offers no opinion at all about the good faith exception's application, and merely remanded for the trial court to reconsider that issue in light of *Herring*, so it is likewise no counterpoint, *United States v. Julius*, 610 F.3d 60, 65-68 (2d Cir. 2010) (remanding because "we are not confident the district court would reach the same conclusion that suppression is proper in light of *Herring*"), *abrogated by United States v. Bershchansky*, 788 F.3d 102, 109 (2d Cir. 2015) (noting that *Julius* was "inconsistent with our long-established precedent" on other grounds); and (3) a Third Circuit opinion that, like *(W.G.) Davis*, involved an officer's "reliance upon binding appellate precedent," so it is similarly far afield, *United States v. Katzin*, 769 F.3d 163, 174 (3d Cir. 2014) (en banc). None of those

strikes us as a real counterweight to the uniform rejection of our dissenting colleague's view.[10]

Tellingly, the government does not advance or defend our dissenting colleague's sweeping reading of *Herring* and *(W.G.) Davis*.  Its briefing confines its argument to the present context, noting that these searches were pursuant to agency

---

[10] Each of the circuits our colleague relies upon has unequivocally noted in subsequent opinions that exclusion typically (though not inevitably) follows from Fourth Amendment violations, contrary to our colleague's assertion that this is a "vestig[ial]" view. *See United States v. Asgari*, 918 F.3d 509, 512 (6th Cir. 2019) (A Fourth Amendment "violation usually comes with a remedy: suppression of the evidence."); *United States v. Kirk Tang Yuk*, 885 F.3d 57, 80 (2d Cir. 2018) ("When a Fourth Amendment violation leads the government to evidence of a crime, the 'exclusionary rule' usually precludes the government from introducing that evidence at trial."); *United States v. Mendez*, 885 F.3d 899, 909 (5th Cir. 2018) ("The exclusionary rule provides the typical remedy for Fourth Amendment violations: suppression of the evidence at trial."); *United States v. Wrensford*, 866 F.3d 76, 88 (3d Cir. 2017) ("[E]vidence must be suppressed unless the Government can demonstrate an exception to the Fourth Amendment's requirements" applies.); *see also Strieff*, 579 U.S. 232, 237-38 (noting "the exclusionary rule . . . often requires trial courts to exclude unlawfully seized evidence" as "the principal judicial remedy to deter Fourth Amendment violations," and discussing "several *exceptions* to th[at] *rule*" (emphases added)).

The two state courts our colleague relies upon are likewise no counterpoint where those courts have made similarly clear in subsequent opinions that exclusion remains the typical judicial response to Fourth Amendment violations. *See State v. Van Linn*, 971 N.W.2d 478, 483 (Wis. 2022) ("When the State obtains evidence in violation of the Fourth Amendment, that evidence typically must be suppressed under the exclusionary rule.").  The vestigial view that the Supreme Court once expressed but has since put to rest is that exclusion is a *necessary* consequence of a Fourth Amendment violation, *(W.G.) Davis*, 564 U.S. at 237-38, an outdated notion that we too squarely reject.

regulations subject to some general congressional oversight and notice-and-comment rulemaking, and stressing those peculiar facets as bringing this case within the good faith exception.[11]  When pressed at oral argument about whether the good faith exception applies when an officer on the street violates the Fourth Amendment so long as there is room for reasonable debate about whether his search was permissible—as our colleague opines—the government balked.  It correctly and in our view prudently acknowledged that the Supreme Court has never applied the good faith exception to a scenario like that, and it is "unclear" if it would do so.

We agree with that assessment.  Perhaps the Supreme Court previewed a fundamental shift in how the exclusionary rule applies nationwide in *Herring* and *(W.G.) Davis*, but that shift has not yet arrived where the Supreme Court has never applied the good faith exception outside of the narrow contexts we have identified.  Just as legislatures do not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns.*, 531 U.S. 457, 468 (2001), the Supreme Court tends not to disguise transformative jurisprudential shifts as merely staying the course, as it insisted it was

---

[11] For reasons we have explained, those particular facets of this case cut the other way, and make the case for suppression especially strong here given that these were not one-off constitutional violations but systemic ones.  The sweep of the countless unconstitutional searches that CSOSA authorized, despite the lack of any impediment to seeking prior judicial authorization, and the absence of any meaningful accountability mechanism outside of suppression, leaves the exclusionary rule to serve a far more important deterrent function here than it would vis-à-vis the one-off constitutional violations of a beat officer.

doing in *Herring* and *(W.G.) Davis*. Those cases, unlike this one, reasonably applied the good faith exception to circumstances that fit comfortably within its prior bounds—to officers acting in reasonable reliance on detached third-party decisionmakers—and claimed to be breaking no new ground. *See Sheehan*, 70 F.4th at 54 ("The *Herring* Court took pains to anchor its holding to precedent. . . . Far from breaking new ground, *Herring* applied the rationale elaborated in *Leon*," and "[n]othing in *Herring* suggests an expansion of the good-faith exception to circumstances that *Leon* previously held to be beyond the pale."). So we will not strip a few choice phrases in those opinions out of their context to mean that the Court has quietly upended exclusionary rule jurisprudence and replaced it with a new uncertain regime that would be unrecognizable to this nation's courts.

As we have already explained, *(W.G.) Davis* was in line with, and a natural extension of, the seminal good faith cases. Officers relied on binding appellate precedent that affirmatively authorized their search—they were even more justified in believing their search was constitutional than the officers who relied on a single magistrate's judgment in *Leon*—so that they themselves were utterly "blameless." *(W.G.) Davis*, 564 U.S. at 249. The same cannot be said of CSOSA, which acted unreasonably in passing its unauthorized regulations and unilaterally authorizing routine unconstitutional searches, rather than simply asking a judge or the Parole Commission to modify any given supervisee's release terms. And *Herring* presents

the only scenario where law enforcement negligence leading to Fourth Amendment violations does not merit suppression, and that is when it is "isolated," "attenuated," and "far removed" and in that sense detached from the constitutional violation at issue. But when law enforcement negligence directly leads to recurring constitutional violations, as it did here, the good faith exception is inapplicable.

### III. Conclusion

For those reasons, we affirm the trial court's suppression ruling.

*So ordered.*

*Associate Judge* MCLEESE, dissenting: The opinion for the court holds that (1) the Court Services and Offender Supervision Agency (CSOSA) violated the Fourth Amendment by requiring Mr. Wells, who was serving a term of supervised release, to wear a GPS monitor; and (2) evidence obtained as a result of that Fourth Amendment violation was properly suppressed by the trial court. I respectfully dissent on the second point.

In support of the conclusion that CSOSA's GPS monitoring in this case violated the Fourth Amendment, the court relies on this court's earlier opinion in *Davis v. United States*, 306 A.3d 89 (D.C. 2023). In that case, this court held that (1) CSOSA lacked statutory authority to promulgate the regulation that purportedly authorized warrantless GPS monitoring of supervised releasees; (2) CSOSA's

regulation thus did not provide a lawful basis upon which warrantless searches could be justified under the "special needs" doctrine, *see generally, e.g.*, *United States v. Jackson*, 214 A.3d 464, 472-73 (D.C. 2019) (general requirements of warrant and individualized suspicion may be inapplicable "when special needs, beyond the normal need for law enforcement," make those requirements "impracticable") (internal quotation marks omitted); and (3) the evidence obtained as a result of the GPS monitoring in the case therefore should have been suppressed as having been obtained in violation of the Fourth Amendment, *Davis*, 306 A.3d at 92-111. In my view, *Davis* was incorrectly decided for reasons well stated by the dissenting opinion in that case. *Id.* at 111-26 (Thompson, J., dissenting). I acknowledge, however, that the opinion for the court in *Davis* is binding on this division. I therefore take as a given for current purposes that the warrantless GPS monitoring in this case violated the Fourth Amendment.

The remaining issue in this case is whether the evidence obtained as a result of that GPS monitoring ought to have been suppressed. The opinion for the court holds that the evidence should have been suppressed, but I see that issue quite differently.

## I. The Law of the Supreme Court

In a series of cases reaching back more than forty years, the Supreme Court has articulated the following clear and consistent framework for determining when evidence obtained in violation of the Fourth Amendment should be suppressed. The Fourth Amendment "says nothing about suppressing evidence." *Davis v. United States*, 564 U.S. 229, 236 (2011). Suppression is a judicially created prudential doctrine that has as its "sole purpose . . . to deter future Fourth Amendment violations." *Id.* at 236-37 (citing *Herring v. United States*, 555 U.S. 135, 141 (2009), and *United States v. Leon*, 468 U.S. 897, 909, 921 & n.22 (1984)).

"Real deterrent value is 'a necessary condition for exclusion,' but it is not 'a sufficient one.'" *Davis*, 564 U.S. at 237 (quoting *Hudson v. Michigan*, 547 U.S. 586, 596 (2006)). "The analysis must also account for the 'substantial social costs' generated by the [exclusionary] rule." *Id.* (quoting *Leon*, 468 U.S. at 907). "Exclusion exacts a heavy toll on both the judicial system and society at large." *Id.* (citing *Stone v. Powell*, 428 U.S. 465, 490-91 (1976)). Suppression "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Id.* (citing *Stone*, 428 U.S. at 490-91). "And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Id.* (citing *Herring*, 555 U.S. at 141). "Our cases hold that society must swallow this bitter pill when necessary, but only as a 'last resort.'" *Id.*

(quoting *Hudson*, 547 U.S. at 591); *see also, e.g.*, *Utah v. Strieff*, 579 U.S. 232, 237-38 (2016) ("Suppression of evidence has always been our last resort, not our first impulse.") (ellipsis and internal quotation marks omitted).

"For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Davis*, 564 U.S. at 237 (citing *Herring*, 555 U.S. at 141, and *Leon*, 468 U.S. at 910). "[T]he [exclusionary] rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging its application." *Hudson*, 547 U.S. at 591 (brackets and internal quotation marks omitted) (quoting *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 364-65 (1998)).

"In a line of cases beginning with *Leon*, 468 U.S. 897, [the Supreme Court] . . . recalibrated [its] cost-benefit analysis in exclusion cases to focus the inquiry on the 'flagrancy of the police misconduct' at issue." *Davis*, 564 U.S. at 238 (quoting *Leon*, 486 U.S. at 911). "The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion 'vary with the culpability of the law enforcement conduct' at issue." *Id.* (brackets omitted) (quoting *Herring*, 555 U.S. at 143). "When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* (quoting *Herring*, 555 U.S. at 144). "But when the police act with an objectively reasonable good-faith belief that their conduct is

lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Id.* (citations and internal quotation marks omitted) (citing *Leon*, 486 U.S. at 908 n.6, 909, 916; *Herring*, 555 U.S. at 137; and *United States v. Peltier*, 422 U.S. 531, 539 (1975)).

The Supreme Court has repeatedly emphasized the last point: on balance, it is not justified to suppress evidence in order to try to deter objectively reasonable police conduct:

> Where the officer's conduct is objectively reasonable, excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that the officer is acting as a reasonable officer would and should act in similar circumstances. Excluding the evidence can in no way affect [the officer's] future conduct unless it is to make [the officer] less willing to do [the officer's] duty.

*Arizona v. Evans*, 514 U.S. 1, 11-12 (1995) (brackets and ellipsis omitted) (quoting *Leon*, 468 U.S. at 919-20); *see also, e.g.*, *Herring*, 555 U.S. at 144 ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."); *Leon*, 468 U.S. at 907 n.6 ("Any rule of evidence that denies the jury access to clearly probative and reliable evidence must bear a heavy burden of justification, and must be carefully limited to the circumstances in

which it will pay its way by deterring official []lawlessness.") (brackets and internal quotation marks omitted).

In sum, "[t]he exclusionary rule exists to deter police misconduct." *Strieff*, 579 U.S. at 241; *see also, e.g.*, *Herring*, 555 U.S. at 137 (Whether evidence obtained in violation of the Fourth Amendment should be suppressed "turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct."); *Evans*, 514 U.S. at 11 ("[T]he exclusionary rule was historically designed to deter police misconduct . . . .") (internal quotation marks omitted); *Illinois v. Krull*, 480 U.S. 340, 348 (1987) (same); *Leon*, 468 U.S. at 916 (same).

"The [Supreme] Court has over time applied [the] 'good-faith' exception across a range of cases." *Davis*, 564 U.S. at 238; *see also id.* at 238-39 (citing *Leon*, 468 U.S. at 922 (declining to suppress evidence obtained in reasonable reliance on warrant later determined to be unlawful under Fourth Amendment); *Krull*, 480 U.S. at 349-50 (declining to suppress evidence obtained in reasonable reliance on statute later determined to be unlawful under Fourth Amendment); and *Evans*, 514 U.S. at 14 (declining to suppress evidence obtained in execution of quashed warrant, where judicial employee had erroneously failed to advise police of quashing of warrant)). "Most recently, in *Herring*, [555 U.S. at 137, the Supreme Court] . . . extended *Evans* in a case where police employees erred in maintaining records in a warrant database. Isolated, nonrecurring police negligence, [the Supreme Court]

determined, lacks the culpability required to justify the harsh sanction of exclusion." *Davis*, 564 U.S. at 239 (brackets, emphasis, and internal quotation marks omitted).

In my view, application of this well-settled framework requires the conclusion that the evidence in this case should not have been suppressed. The opinion for the court correctly acknowledges both that (1) before this court's decision in *Davis*, individual CSOSA employees did not engage in misconduct by following CSOSA's regulation; and (2) individual CSOSA employees would not be deterred from following similar regulations in the future by suppression of the evidence in this case. *Ante* at 17 & n.1. So the issue is whether suppression here is warranted based on CSOSA's conduct as an agency. The opinion for the court at times appears to acknowledge, in my view correctly, that CSOSA could reasonably have believed that its regulation was statutorily authorized. *Ante* at 30, 32. I note, however, that the opinion for the court at other times seems to take a rather different view, stating for example that "the statutory scheme already made clear enough" that CSOSA lacked statutory authority to promulgate the regulation. *Ante* at 27. I see no need to belabor the point here, but I do not agree with the latter characterization.

If CSOSA had been correct that it had statutory authority to promulgate the regulation at issue, then the warrantless searches authorized by the regulation would in my view have been lawful under the special-needs exception. Neither the opinion of this court in *Davis* nor the opinion for the court in this case holds otherwise. It

follows that, far from engaging in "misconduct" by conducting the GPS search in this case, CSOSA instead acted in objectively reasonable good faith. In my view, controlling authority directs us to conclude that the evidence in this case therefore should not have been suppressed.

As I will discuss more fully *infra*, moreover, the same conclusion follows in my view from a balancing of the costs and benefits of exclusion, conducted within the mandatory framework the Supreme Court has provided.

The opinion for the court reaches the opposite conclusion, and my views differ from those of the court in several respects. I note that I do not understand either the parties or the opinion for the court to dispute that this court is obliged to follow the holdings of the Supreme Court with respect to the proper scope of the exclusionary rule under the Fourth Amendment. The principal disagreement appears instead to be about what those holdings are.

The opinion for the court presents a very different picture of the Supreme Court's exclusionary-rule decisions than I have just presented. In a nutshell, the opinion for the court takes the view that (1) suppression of evidence is "typically" or "'usually'" the remedy for Fourth Amendment violations, *ante* at 11 (quoting *Krull*, 480 U.S. at 347); (2) the rationale for the good-faith exception is that suppression of evidence is unwarranted when officers are "blameless" and rely on

the "superior judgments" of "detached" or "neutral" decisionmakers, *ante* at 12-14; (3) although there is some broader "language" in two of the Supreme Court's more recent cases (*Davis* and *Herring*), giving effect to that language would cause a "cataclysmic shift" in the Supreme Court's prior exclusionary-rule law, *ante* at 35; and (4) interpreting the language in those two cases as causing such a shift would be unreasonable, because "[j]ust as legislatures do not hide elephants in mouseholes, the Supreme Court tends not to disguise transformative jurisprudential shifts as merely staying the course," *ante* at 39 (citation and internal quotation marks omitted). I respectfully disagree with each of the foregoing points.

(1) It is true that the Supreme Court said in *Krull* that the "exclusionary rule usually precludes [the use of evidence obtained in violation of the Fourth Amendment] in a criminal proceeding against the victim of the illegal search and seizure." 480 U.S. at 347. That statement was made nearly forty years ago, however, and in my view, the statement is a vestige of the far more expansive view of the exclusionary rule that the Supreme Court once held but long ago abandoned. *See, e.g.*, *Davis*, 564 U.S. at 237-38 ("[T]here was a time when our exclusionary-rule cases were not nearly so discriminating in their approach to the doctrine. . . . In time, however, . . . [w]e abandoned the old, reflexive application of the doctrine, and imposed a more rigorous weighing of its costs and deterrence benefits.") (internal quotation marks omitted). In the many years since the statement in *Krull* that the

opinion for the court relies upon, the Supreme Court has repeatedly emphasized that suppression of evidence under the exclusionary rule is not usual but rather is "a last resort." *Strieff*, 579 U.S. at 237-38 (internal quotation marks omitted).

The opinion for the court states that the Supreme Court has abandoned only the idea that "exclusion is a *necessary* consequence of a Fourth Amendment violation," *ante* at 38 n.10, and that it is still good law that exclusion is the "typical" remedy, *id.* I do not see how that position can be reconciled with the Supreme Court's repeated holdings that suppression is a last resort.

(2) I do not agree that the Supreme Court's rationale for the good-faith exception is that law enforcement has been "blameless" in relying on the judgment of "neutral" and "superior" decisionmakers. *Ante* at 12-14. The Supreme Court does use the word "blameless" once in *Davis*, explaining that officers are "blameless" when they rely on controlling law from a federal circuit that is later overruled. 564 U.S. at 249. As noted earlier in this opinion, however, elsewhere in *Davis* and in its other exclusionary-rule cases, the Supreme Court uses different terms to describe the police conduct at issue, drawing a consistent distinction between conduct that is "objectively reasonable," as to which the exclusionary rule should not apply, and conduct that is "culpable," "wrongful," or "misconduct," as to which the exclusionary rule ordinarily should apply. In other words, the Supreme Court's exclusionary-rule cases establish that the key issue is "objective

reasonableness," not "blameworthiness," to the extent that there is a distinction between the two concepts (more on that topic later).

Moreover, the idea of "blamelessness" cannot explain the outcome of the Supreme Court's exclusionary-rule cases. Most notably, the unconstitutional search in *Herring* was the result of a negligent error by a law-enforcement employee, yet the Supreme Court concluded that suppression of evidence was unwarranted. 555 U.S. at 136-48. The opinion for the court in this case acknowledges that *Herring* does not fit the hypothesized "throughline" of blameless reliance on the judgment of neutral and superior decisionmakers. *Ante* at 13, 14-15. The opinion for the court attempts to address that problem by describing *Herring* as an "attenuation" case that turned on the factual distance between the employee's error and the search months later by a different officer from a different county. *Ante* at 14-15, 29, 34 n.8. I agree that the concept of attenuation is a part of the Supreme Court's analysis in *Herring*, which involved law-enforcement conduct that was negligent rather than objectively reasonable. But *Herring* contradicts rather than supports the idea that the good-faith exception requires attenuation in cases in which law enforcement has acted objectively reasonably. *See, e.g., People v. Robinson*, 224 P.3d 55, 69 (Cal. 2010) ("We next note that the Supreme Court's general holding [in *Herring*] regarding what conduct triggers the exclusionary rule does not focus on the issue of attenuation . . . . Instead, the high court requires us to focus on whether the facts

presented warrant application of the exclusionary rule 'to deter deliberate, reckless, or grossly negligent conduct, or . . . recurring or systemic negligence.'") (quoting *Herring*, 555 U.S. at 144).

The concept of neutrality figures heavily in *Leon*, which involved officers' reliance on warrants issued by neutral magistrates. *E.g.*, 468 U.S. at 913. But the concept of neutrality is not the basis of *Krull*, for example, which held that evidence obtained in reasonable reliance on a statute later determined to be unlawful under Fourth Amendment should not be suppressed. 480 U.S. at 349-50. The Supreme Court in *Krull* did not describe legislators as "neutral," instead acknowledging that legislators "are not neutral judicial officers." *Id.* at 350 (internal quotation marks omitted). Rather, the court in *Krull* made a series of different points about legislators, including:

- legislatures are not "adjuncts to the law enforcement team" "engaged in the often competitive enterprise of ferreting out crime," *id.* at 350-51 (internal quotation marks omitted);

- unlike law-enforcement officers, legislators do not make "hurried judgment[s]," *id.* at 351;

- courts presume that legislative enactments are constitutional, *id.*;

- There is no evidence suggesting that Congress or state legislatures have enacted a significant number of statutes permitting warrantless administrative searches violative of

the Fourth Amendment. . . . Thus, we are given no basis for believing that legislators are inclined to subvert their oaths and the Fourth Amendment and that lawlessness among these actors requires application of the extreme sanction of exclusion.

*Id.* (internal quotation marks omitted); and

- Legislators enact statutes for broad, programmatic purposes, not for the purpose of procuring evidence in particular criminal investigations. Thus, it is logical to assume that the greatest deterrent to the enactment of unconstitutional statutes by a legislature is the power of the courts to invalidate such statutes. . . . There is nothing to indicate that applying the exclusionary rule to evidence seized pursuant to the statute prior to the declaration of its invalidity will act as a significant, additional deterrent.

*Id.* at 352.

As I will explain more fully later, in my view the points that *Krull* made about legislatures are almost all fully applicable to CSOSA.

Finally, I have found no reference whatsoever in the Supreme Court's exclusionary-rule cases to the concept of "superior" decisionmakers. That concept seemingly has no application to cases such as *Evans* and *Herring*, which as noted above involved inadvertent clerical errors.

Thus, the three considerations identified by the opinion for the court as critical components of the good-faith exception to the exclusionary rule—blamelessness, neutrality, and superiority—do not explain either the reasoning or the outcome of the Supreme Court's exclusionary-rule cases. In my view, this court lacks authority

to disregard the Supreme Court's actually stated rationale in favor of a hypothesized implicit "throughline" that contradicts the binding framework for decision that the Supreme Court has provided.

(3) The opinion for the court dismisses what I have described as the Supreme Court's binding framework for deciding exclusionary-rule issues as "language" in only two Supreme Court cases. *Ante* at 31. I respectfully disagree with that characterization. As I have attempted to show, a long line of Supreme Court cases has established a clear and consistent framework for deciding exclusionary-rule issues.

It is true that courts are permitted to treat unnecessary dicta or unduly broad language as nonbinding in later cases. *See, e.g.*, *Richman Towers Tenants' Ass'n, Inc. v. Richman Towers LLC*, 17 A.3d 590, 598 (D.C. 2011) ("[The] words of our opinions are to be read in the light of the facts of the order under discussion. To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court. General expressions transposed to other facts are often misleading.") (emphasis omitted) (quoting *Armour & Co. v. Wantock*, 323 U.S. 126, 132-33 (1944)); *Martin v. Bicknell*, 99 A.3d 705, 710 (D.C. 2014) (declining to treat "passing statement" on issue not presented as binding precedent). In my view, however, those doctrines are not applicable to the Supreme Court's repeated

holdings as to the proper framework for deciding exclusionary-rule issues. Rather, the Supreme Court has held that such lines of reasoning, relied upon as the basis of the decisions at issue, do constitute binding authority. *See Seminole Tribe v. Florida*, 517 U.S. 44, 67 (1996) ("As a general rule, the principle of *stare decisis* directs us to adhere not only to the holdings of our prior cases, but also to their explications of the governing rules of law.") (internal quotation marks omitted). This court has expressly endorsed the view of binding precedent articulated by the Supreme Court in *Seminole Tribe*. *Holman v. United States*, 335 A.3d 880, 883 (D.C. 2025).

As a rationale for refusing to adhere to the Supreme Court's binding framework for deciding exclusionary-rule issues, the opinion for the court asserts that it is not "mere happenstance . . . that every single one of the Supreme Court's good-faith cases involved officer reliance on some detached third-party judgment." *Ante* at 34. *Herring* contradicts that assertion, however, because *Herring* involved a negligent mistake, not a "judgment," made by a police officer, not a third party who was "detached" in the sense that term is used in the context of the exclusionary rule. *See, e.g.*, *Leon*, 468 U.S. at 913 (explaining that search warrants are "issued by a detached and neutral magistrate"). More fundamentally, even if it were true that the Supreme Court had never before applied its framework for deciding exclusionary-rule issues to a case in which an officer was not relying on a "detached third-party judgment," that would only raise the question of how to apply the

Supreme Court's framework to that particular context. It would not permit a lower court to reject the Supreme Court's framework and create a different framework of its own that contradicts binding principles of law established by the Supreme Court.

For the foregoing reasons, I conclude that the opinion for the court is not free to dismiss the Supreme Court's binding framework for deciding exclusionary-rule issues as mere "language" from a couple of relatively recent Supreme Court cases.

(4) As basis for refusing to give effect to what I view as the Supreme Court's binding directives, the opinion for the court states that "[j]ust as legislatures do not hide elephants in mouseholes, the Supreme Court tends not to disguise transformative jurisprudential shifts as merely staying the course." *Ante* at 39 (citation and internal quotation marks omitted). I disagree with this statement for several reasons. First, far from working a "transformative jurisprudential shift[]," the reasoning in *Davis* and *Herring* is entirely consistent with the framework for deciding exclusionary-rule issues that the Supreme Court has established over the last forty years, beginning with *Leon*.

Moreover, to use the metaphor chosen by the opinion for the court in this case, this line of Supreme Court authority has been understood all along to be a potential elephant—nothing has been hidden in mouseholes. In *Leon*, the Supreme Court acknowledged that it was "modif[ying]" the exclusionary rule. 486 U.S. at 905. The

Supreme Court also signaled that the modified approach it was adopting might well have broad implications. *E.g.*, *id.* at 909 ("[T]he balancing approach that has evolved in various contexts—including criminal trials—forcefully suggests that the exclusionary rule be more generally modified to permit the introduction of evidence obtained in the reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment.") (brackets and internal quotation marks omitted); *see also, e.g.*, Wayne R. LaFave, 1 *Search and Seizure* § 1.3(g) (6th ed. Nov. 2024) ("[M]uch of the reasoning in *Leon* will offer support for such an extension of that case beyond the with-warrant situation."). The dissent in *Leon* emphasized the potentially broad implications of the Supreme Court's decision. *E.g.*, 468 U.S. at 959 (Brennan, J., dissenting) ("[T]he full impact of the Court's regrettable decisions will not be felt until the Court attempts to extend this rule to situations in which the police have conducted a warrantless search solely on the basis of their own judgment about the existence of probable cause and exigent circumstances. When that question is finally posed, I for one will not be surprised if my colleagues decide once again that we simply cannot afford to protect Fourth Amendment rights."). The decision in *Leon* also triggered a vast scholarly response, much of it focused on the potential breadth of the decision. *See, e.g.*, Silas Wasserstrom & William J. Mertens, *The Exclusionary Rule on the Scaffold: But Was It a Fair Trial?*, 22 Am. Crim. L. Rev. 85, 178 (Fall 1984) ("[I]t seems likely that the Court will expand the reasonable mistake exception to warrantless searches as well."). Without unduly belaboring the

point here, essentially the same is true about the Supreme Court's other "good faith" exclusionary-rule decisions in the last forty years: broad reasoning in the opinion for the court, dissenting opinions expressing concern about the potential breadth of the decisions, and substantial scholarly literature addressing the possible breadth of the decisions. *See, e.g.*, *Davis*, 564 U.S. at 258-59 (Breyer, J., dissenting) (expressing concern that logic of decision in *Davis* will lead to conclusion that suppression is unwarranted whenever officer conducts warrantless search in objectively reasonable belief that search was lawful under Fourth Amendment).

In sum, taking the Supreme Court at its word would in my view not remotely be making an elephant out of a hidden mouse.

## II.  Objective Reasonableness and Blamelessness

The opinion for the court expresses the view that even if CSOSA could reasonably have believed that it had statutory authority to promulgate the regulation at issue, CSOSA's conduct in promulgating the regulation nevertheless was not "in any sense reasonable." *Ante* at 32-34.  I disagree.

The opinion for the court makes two subsidiary points here.  First, relying on the Supreme Court's decision in *Heien v. North Carolina*, 574 U.S. 54, 66-67 (2014), the opinion for the court states that if CSOSA's promulgation of the regulation had been reasonable, then CSOSA's conduct would have rested on a reasonable mistake

of law that would not even have violated the Fourth Amendment. *Ante* at 31-32. Because this court in *Davis* held that CSOSA's conduct violated the Fourth Amendment, the opinion for the court in this case further reasons that CSOSA's conduct was not reasonable. *Id*. The main problem with this line of reasoning is that the court in *Davis* did not address the question whether CSOSA's regulation, even if not statutorily authorized, nevertheless rested on a reasonable mistake of law so that CSOSA's searches therefore did not violate the Fourth Amendment under the reasoning of *Heien*. *Davis*, 306 A.3d at 92-111. Presumably, the court in *Davis* did not address that issue because the United States in *Davis* did not raise the issue. In my view, the opinion for the court in this case errs by treating the court in *Davis* as having decided an issue that the court in *Davis* did not actually consider. I do not understand the United States to have raised a *Heien* argument in the present case either, so I have no occasion to decide the issue. Without expressing a firm view on the merits, I do note, however, that it seems to me that a reasonable argument could have been made that even if CSOSA lacked statutory authority to promulgate the regulation at issue, its decision to do so was a reasonable mistake of law that did not violate the Fourth Amendment under the reasoning of *Heien*.

Second, the opinion for the court expresses the broader view that even if a law-enforcement agency or officer reasonably believes that a given warrantless search is lawful under the Fourth Amendment, it nevertheless is not reasonable for

the agency or officer simply to act on that reasonable belief without instead checking with, or getting authorization from, a neutral third party, unless exigent circumstances preclude doing so. *Ante* at 32-34. As an original matter, I can understand the potential appeal of requiring neutral third-party preapproval before a warrantless search can be viewed as objectively reasonable for purposes of the exclusionary rule. In my view, however, the Supreme Court's framework for resolving exclusionary-rule issues forecloses such a requirement. For more than forty years, the Supreme Court instead has repeatedly said that "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful . . . , the 'deterrence rationale loses much of its force,' and exclusion cannot 'pay its way.'" *Davis*, 564 U.S. at 238 (internal quotation marks omitted) (quoting *Leon*, 468 U.S. at 908 n.6, 909, 919, and *United States v. Peltier*, 422 U.S. 531, 539 (1975)). Put differently, in my view the Supreme Court has made clear that a police officer (or a law-enforcement agency such as CSOSA) acts blamelessly, for purposes of the exclusionary rule, whenever the officer (or agency) conducts a search in the objectively reasonable belief that the search was lawful. For the reasons I have explained, I think that the lower courts are required to take the Supreme Court at its word.

### III.  Balancing the Costs of Suppression and the Value of Deterrence

### A.  The Costs of Suppression

As previously noted, *supra* at 43, the Supreme Court has directed courts to suppress evidence under the exclusionary rule only as a last resort, because suppression's costs are heavy.  Specifically, suppression "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Davis*, 564 U.S. at 237 (citing *Stone*, 428 U.S. at 490-91).  "And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Id.* (citing *Herring*, 555 U.S. at 141).

The opinion for the court acknowledges the costs of suppression but for the most part only fleetingly and abstractly. *E.g.*, *ante* at 3.  The most specific discussion of the costs of suppression is the observation that suppressing the fruits of searches conducted under CSOSA's regulation apparently would not affect a large number of cases. *Id.* at 28 & n.5.  I have no quarrel with that observation, but I do note that I believe that the weighing of costs and benefits probably needs to be conducted on a somewhat more general basis: the costs and benefits of suppression not just in a single case, or with respect to a single regulation, but rather with respect to the general context at issue.  For current purposes, for reasons I will explain later, I take that context to be the costs and benefits of a rule requiring suppression of evidence

obtained by warrantless searches pursuant to a regulation that a law-enforcement agency reasonably believed lawfully authorized the searches but that was later determined to have been unauthorized. I tend to doubt that a rule requiring suppression in such cases would impose large systemic costs, primarily because I do not believe that it has been shown that law-enforcement agencies have often promulgated such regulations. Where suppression is required, though, as in the present case, I take as a given from the Supreme Court that the loss of probative and reliable evidence is a substantial cost.

## B. The Value of Deterrence

With respect to deterrence of unconstitutional searches, the opinion for the court reasons as follows: (1) CSOSA is a law-enforcement agency, not a neutral decisionmaker, *ante* at 18-21; (2) law-enforcement agencies have an incentive to "push the Fourth Amendment envelope in systematic ways," *id.* at 23; (3) other possible disincentives to agency overreaching are ineffective, because CSOSA officers (like other agency employees) have qualified immunity that will protect them from being held personally liable except in the most egregious cases, agency notice-and-comment procedures are ineffective, and congressional oversight is "limited, infrequent, and ad hoc," *id.* at 23-26 (internal quotation marks omitted); (4) CSOSA's regulation has yielded "innumerable law enforcement benefits," *id.* at 28; (5) suppression of the evidence obtained as a result of CSOSA's regulation is a

necessary counterweight to those benefits, *id.* at 27; and (6) that is particularly true because adopting a general "objective reasonableness" standard would preclude suppression except in "the most egregious" cases, because courts would apply the qualified-immunity standard, which precludes imposition of monetary liability except when no reasonable officer could have thought that the conduct at issue was lawful, *id.* at 35 (citing *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (liability can be imposed only if official's conduct violated a "clearly established right," *i.e.*, a right that is "sufficiently clear that every reasonable official would have understood that what [the official] is doing violates that right") (internal quotation marks omitted)).

My assessment of the issue of deterrence differs substantially from the approach reflected in the opinion for the court. I note at the outset, however, a couple of points of agreement. First, I agree that CSOSA is not a neutral decisionmaker but rather is a law-enforcement agency. *Ante* at 18-21. That point should not be overstated, however. In *United States v. Jackson*, 214 A.3d 464 (D.C. 2019), and *Atchison v. United States*, 257 A.3d 524 (D.C. 2021), this court held that CSOSA's GPS monitoring of probationers and people on supervised release was justified by "special needs, beyond the normal need for law enforcement." *Jackson*, 214 A.3d at 473 (internal quotation marks omitted); *Atchison*, 257 A.3d at 530-31. Specifically, we noted that such monitoring permissibly "deter[s] recidivism and encourages[s] rehabilitation." *Atchison*, 257 A.3d at 531; *see also Jackson*, 214

A.3d at 475. In other words, contrary to the picture presented by the opinion for the court, *ante* at 18-21, this court has already held that the regulation at issue in this case was not promulgated by CSOSA acting primarily to advance the "normal need for law enforcement," *Jackson*, 214 A.3d at 473 (internal quotation marks omitted), *i.e.*, to engage in the "often competitive enterprise of ferreting out crime," *Scott*, 524 U.S. at 368 (internal quotation marks omitted).

Second, as an original matter, I can see a quite reasonable argument that it would be valuable to try to deter agencies and individual officers from relying on their own good-faith views about the legality of their conduct, even when those views are objectively reasonable. Such an approach could be viewed as providing a valuable zone of safety, tending to discourage unlawful searches that after all are unlawful even if they were reasonably thought otherwise at the time they were conducted. My problem with this line of reasoning, however, is that, as I have already explained, I understand it to be foreclosed by binding Supreme Court authority.

As for my points of disagreement about deterrence:

(1) I view this case as rather similar to *Krull*. I acknowledge one difference: although legislatures are not "neutral," they are not law-enforcement agencies. Nonetheless, whether objectively reasonable regulations (not primarily directed at

ferreting out crime) promulgated by law-enforcement agencies raise concerns that justify application of a suppression remedy is an issue quite similar to the issue in *Krull*. As previously noted, *supra* at 52-53, almost everything that the Supreme Court said about legislative enactments in *Krull* applies equally to agency regulations like that at issue in this case: (a) such regulations are not part of the "often competitive enterprise of ferreting out crime," *Krull*, 480 U.S. at 350-51; (b) agency regulations are not promulgated in haste, *id.* at 351; (c) agency regulations are presumed to be constitutional, *id.* at 351; *see, e.g.*, *Cap. Auto Sales, Inc. v. District of Columbia*, 1 A.3d 377, 382 (D.C. 2010) ("There is a strong presumption of constitutionality afforded to [administrative] regulations . . . .") (internal quotation marks omitted); (d) there is no evidence suggesting that either CSOSA in particular or administrative agencies, law-enforcement or otherwise, "have enacted a significant number of statutes [or regulations] permitting warrantless administrative searches violative of the Fourth Amendment," *Krull*, 480 U.S. at 351; (e) we have no basis for believing that officials at CSOSA specifically or administrative agencies more generally "are inclined to subvert their oaths and the Fourth Amendment and that lawlessness among these actors requires application of the extreme sanction of exclusion," *id.* at 351 (internal quotation marks omitted); (f) administrative agencies promulgate regulations "for broad, programmatic purposes, not for the purpose of procuring evidence in particular criminal investigations," *id.* at 352; (g) "it is logical to assume that the greatest deterrent" to

the promulgation of unconstitutional regulations by an administrative agency "is the power of the courts to invalidate such" regulations, *id.*; and (h) "[t]here is nothing to indicate that applying the exclusionary rule to evidence seized pursuant to the [regulation] prior to the declaration of its invalidity will act as a significant, additional deterrent," *id.*

(2) Although I acknowledge that notice-and-comment procedures and legislative oversight are not perfect solutions, I do not agree with the rather stark critique of those features of the administrative process as "ineffectual." *Ante* at 24.

(3) It seems to me that the opinion for the court actually undermines rather than supports the theory that suppression of the evidence obtained as a result of CSOSA's regulation would meaningfully deter a hypothetical agency that was zealously focused on systematically "push[ing] the Fourth Amendment envelope," *ante* at 23, at least as to regulations comparable to the regulation at issue in this case. According to the opinion of the court, CSOSA's regulation yielded "innumerable law enforcement benefits." *Id.* at 28. That assessment, moreover, does not include the regulation's primary benefits, beyond the normal need for law enforcement, in monitoring people who are under supervision to prevent crime by people on supervision and to promote rehabilitation. The opinion for the court also indicates that a suppression remedy would not affect a large number of cases. *Id.* at 28 & n.5. If those two propositions are correct, then it would seem to follow that even if a

suppression remedy were imposed, a future agency zealously seeking to push the Fourth Amendment envelope would make the same choice that CSOSA made in the present case.

(4) I see no adequate basis for the assumption of the opinion for the court that adopting an "objective reasonableness" standard would permit suppression only if the law-enforcement conduct at issue was so egregious that personal monetary liability could properly be imposed under the qualified-immunity standard. *Ante* at 35. To the contrary, the Supreme Court explained in *Heien* that the question whether a mistake of law was reasonable for purposes of determining whether the Fourth Amendment was violated is distinct from the qualified-immunity standard. 574 U.S. at 67 ("[T]he inquiry is not as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity . . . . Thus, an officer can gain no Fourth Amendment advantage through a sloppy[ ]study of the laws [the officer] is duty-bound to enforce."). In my view, the same should be true of the question whether a warrantless search was objectively reasonable for purposes of the exclusionary rule. The qualified-immunity standard "protects all but the plainly incompetent or those who knowingly violate the law" from being subject to personal monetary liability for the official decisions. *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). I believe that the standard of objective reasonableness in the current context should be more demanding, along the lines indicated by the Supreme Court in *Heien*.

I need not further delve into a precise definition of "objective reasonableness" in this case, however. As I have noted, my view as an original matter is that this court's decision in *Davis* was incorrect. *Supra* at 41-42. It would follow that CSOSA was not merely reasonable but rather correct to think that its regulation and the ensuing searches were lawful. I take as a given for current purposes, however, that CSOSA was incorrect and that *Davis* was correctly decided. But I see CSOSA's view as entirely reasonable, even if I assume for current purposes that it was incorrect. Thus, this case is much like *Heien*, where the Supreme Court had "little difficulty concluding that the officer's error of law was reasonable." 574 U.S. at 67; *see also id.* at 71 (Kagan, J., concurring) ("[T]he statute poses a quite difficult question of interpretation, and [the officer]'s judgment, although overturned, had much to recommend it.").

## C. Balancing

I believe that we are required to approach this case from the perspective that suppression is a last resort and that a party seeking to justify it "must bear a heavy burden." *Leon*, 468 U.S. at 907 n.6 (internal quotation marks omitted). For the reasons I have stated, I do not believe that Mr. Wells has carried that burden.

The opinion for the court states that failing to suppress evidence obtained based on a regulation that a law-enforcement agency reasonably believed was

lawful, but a court later determined was not lawful, would "gut" the Fourth Amendment or transform the Fourth Amendment into "toast." *Ante* at 22, 23. I view those statements as mere hyperbole. However this case is decided, the Fourth Amendment will indisputably have enormous scope and consequence, and appropriately so.

## IV. Lower-Court Decisions

The opinion for the court suggests that the federal courts of appeals are "in accord" in giving the Supreme Court's exclusionary-rule decisions a narrow rather than "sweeping" reading. *Ante* at 36; *see also id.* at 40 (following Supreme Court's reasoning in *Davis* and *Herring* would result in "regime that would be unrecognizable to this nation's courts"). I do not view that suggestion as accurate. To the contrary, several courts of appeals have relied on the Supreme Court's exclusionary-rule cases to take a view of the good-faith exception to the exclusionary rule that is quite a bit more expansive than the view taken by the opinion for the court in this case. *See United States v. Katzin*, 769 F.3d 163, 169-87 (3d Cir. 2014) (en banc) (even if no prior binding authority at time of search established lawfulness of warrantless search later determined to be unlawful, suppression of evidence not justified if officers had objectively reasonable belief that search was lawful); *United States v. Master*, 614 F.3d 236, 242-43 (6th Cir. 2010) (interpreting Supreme Court's decisions in *Hudson* and *Herring* to undermine prior circuit law and to establish that

"the crucial finding needed to suppress evidence is whether 'police misconduct is sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system'") (quoting *Herring*, 555 U.S. at 144); *United States v. Julius*, 610 F.3d 60, 65-68 (2d Cir. 2010) (assuming that warrantless search of parolee's apartment violated Fourth Amendment, remanding for trial court to conduct case-specific balancing as to whether benefits of suppression would outweigh costs, taking into account, among other things, whether officers' conduct reflected "the requisite level of culpability"); *United States v. Williams*, 622 F.2d 830, 846-47 (5th Cir. 1980) (en banc) ("Henceforth in this circuit, when evidence is sought to be excluded because of police conduct leading to its discovery, it will be open to the proponent of the evidence to urge that the conduct in question, if mistaken or unauthorized, was yet taken in a reasonable, good-faith belief that it was proper. If the court so finds, it shall not apply the exclusionary rule to the evidence."); *see also State v. Burch*, 961 N.W.2d 314, 318-22 (Wis. 2021) (even if officer violated Fourth Amendment by obtaining cell-phone information without obtaining warrant, suppression was not justified because officer's conduct was at worst negligent and costs of suppression outweighed any deterrence benefit); *Collins v. Commonwealth*, 824 S.E.2d 485, 488-96 (Va. 2019) (suppression was not justified because at time of search reasonably well-trained officer would not have known that warrantless search was impermissible under Fourth Amendment).

I am unpersuaded by the contention of the opinion for the court that the above-cited cases are not "a real counterweight to the uniform rejection" by the lower courts of the Supreme Court's controlling framework for deciding exclusionary-rule issues. *Ante* at 38. For example, contrary to the suggestion of the opinion for the court, *ante* at 37, the United States Court of Appeals for the Fifth Circuit relied on that framework when holding en banc that the good-faith exception applies to warrantless searches by police officers. *United States v. De Leon-Reyna*, 930 F.2d 396, 400 (5th Cir. 1991) (relying on *Leon*, 468 U.S. at 906). Similarly, I believe that it is inaccurate to say that the decision of the United States Court of Appeals for the Second Circuit in *Julius* "offer[ed] no opinion at all about the good faith exception's application." *Ante* at 37. *See Julius*, 610 F.3d at 66-68 (holding that Supreme Court's decision in *Herring* imposed new requirement that courts make case-specific determination "whether the deterrent effect of applying the exclusionary rule outweighs the cost of the rule's application").

It is true, as the opinion for the court in this case notes, that several federal circuits have continued to take a very narrow approach to the good-faith exception notwithstanding the Supreme Court authority I have emphasized. *Ante* at 36-37. For the reasons expressed in this opinion, I do not find those decisions persuasive.

The opinion for the court in this case correctly points out that this court has already adopted a narrow interpretation of the Supreme Court's decision in *Davis*,

limiting *Davis* to cases in which squarely controlling precedent, rather than arguably distinguishable precedent, established the legality of the search at the time the search was conducted. *Ante* at 35-36. I view this court's exclusionary-rule decisions as rather problematic. For example, just last year, the en banc court reinstated a decision stating that suppression is generally required under the Fourth Amendment. *Mayo v. United States*, 315 A.3d 606, 639 (D.C. 2024) (en banc), *reinstating in pertinent part Mayo v. United States*, 266 A.3d 244, 269 (D.C. 2022). As far as I have been able to determine, no prior opinion for this court has ever acknowledged, much less addressed, the Supreme Court's contrary holding that suppression is a last resort.

In a concurring opinion, I recently addressed the difficult question of what a judge on a lower court should do when the judge perceives a conflict between binding Supreme Court precedent and normally binding prior decisions of the judge's court. *D.W. v. United States*, No. 19-CF-0143, 2025 WL 1982226, at *6-9 (D.C. July 17, 2025) (McLeese, J., concurring). That opinion has since been vacated pending rehearing en banc. *D.W. v. United States*, No. 19-CF-0143, 2025 WL 2233816 (D.C. Aug. 4, 2025). I therefore repeat the pertinent discussion here.

In general terms, the question is: How should a lower-court judge proceed if (1) the judge personally interprets a decision of the Supreme Court of the United States in one way; but (2) a lower-court decision normally binding on the judge,

either by the judge's own court or by a higher court other than the Supreme Court of the United States, has adopted a different and inconsistent interpretation of the Supreme Court's opinion? Should the judge follow the judge's personal view as to the proper interpretation of the Supreme Court opinion or the differing view adopted by the normally binding decision of the lower court?

As far as I have been able to determine, neither the Supreme Court of the United States nor this court has expressly answered this question. I have located several decisions in which federal circuit courts have squarely addressed the question, and all of those decisions hold that judges on a subsequent panel are bound by prior circuit decisions interpreting Supreme Court cases, even if those judges believe that the prior circuit decisions misinterpreted the Supreme Court cases at issue. *See Smith v. GTE Corp.*, 236 F.3d 1292, 1301-04 (11th Cir. 2001) (even if prior decision of circuit misinterpreted Supreme Court case that prior decision discussed, subsequent panel of circuit was bound by prior circuit decision); *Barber v. Johnson*, 145 F.3d 234, 237 (5th Cir. 1998) (same); *Clow v. U.S. Dep't of Hous. & Urb. Dev.*, 948 F.2d 614, 616 n.2 (9th Cir. 1991) (per curiam) ("The dissent does not argue that an intervening Supreme Court decision has cast doubt on our prior circuit law, rather it asserts that the very Supreme Court decision upon which these cases rely does not support their holdings. If we were all free to disregard our prior circuit law based on our own predilections as to whether these decisions properly

construe the Supreme Court cases upon which they rely, the doctrine of stare decisis would have little meaning in our circuit. Accordingly, contrary to the dissent's suggestion, we have no authority to revisit our circuit's embrace of the doctrine of hypothetical jurisdiction."), *abrogated on other grounds by Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998). The sole state case I have found addressing an analogous situation reached the equivalent conclusion. *State v. Cousins*, 473 P.3d 961 (table), No. 121,676, 2020 WL 6243299, at *9 (Kan. Ct. App. Oct. 23, 2020) ("Cousins argues that *Perkins* was wrongly decided because it misinterpreted United States Supreme Court caselaw. But this court is bound by Kansas Supreme Court precedent unless there is some indication that the court is departing from its earlier position, and here there is not.").

As an aside, I note that there appear to be conflicts in the federal circuit courts about how to handle two related but distinct situations: (1) where a prior circuit decision has overlooked Supreme Court authority, *compare, e.g.*, *Sabal Trail Transmission, LLC v. 18.27 Acres of Land*, 59 F.4th 1158, 1160, 1173 (11th Cir. 2023) (under "prior-precedent rule" prior decisions of circuit are binding even if prior circuit decisions overlooked contrary Supreme Court decisions), *with, e.g.*, *United States v. Tann*, 577 F.3d 533, 542 (3d Cir. 2009) (subsequent circuit panel not bound by prior decision of circuit that did not address contrary Supreme Court authority), and (2) where a circuit-court panel "believes that there is conflict between

an initial binding precedent [of the circuit] and a subsequent decision [of the circuit] that interpreted the initial precedent," *Parker v. K & L Gates, LLP*, 76 A.3d 859, 880 n.2 (D.C. 2013) (McLeese, J., concurring) (citing cases).

Turning back to the precise issue before me, I do not view that issue as an easy one. On one hand, the obligation of lower courts to follow the holdings of the Supreme Court has been described as "absolute, as it must be in a hierarchical system." *Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*, 117 F.4th 389, 395 (6th Cir. 2024) (quoting *Ramos v. Louisiana*, 590 U.S. 83, 124 n.5 (2020) (Kavanaugh, J., concurring in part)). It seems counterintuitive that a decision of a lower court that incorrectly interprets a Supreme Court decision should be treated as requiring later judges of that lower court to follow incorrect decisions of that lower court rather than the actual holding of the Supreme Court.

On the other hand, the view that a lower-court decision interpreting a Supreme Court case is not binding on judges of that lower court would have surprising and undesirable consequences. As the Ninth Circuit put it, "If we were all free to disregard our prior circuit law based on our own predilections as to whether these decisions properly construe the Supreme Court cases upon which they rely, the doctrine of stare decisis would have little meaning . . . ." *Clow*, 948 F.2d at 616 n.2. To further illustrate the potential implications of such an approach, it would seem to follow that federal district-court judges could decline to follow decisions of their

circuit interpreting Supreme Court cases, instead taking the view that their obligation was to follow their own understanding of what the Supreme Court had held.

On balance, I am persuaded by the view taken by the circuit courts that have addressed the issue. Thus, I conclude that, at least barring unusual circumstances, I am bound by the holdings of decisions of this court interpreting a Supreme Court case, even if in my view those decisions incorrectly interpreted the Supreme Court case at issue.

Turning back to the present case, I agree with those courts that have held that divisions of the lower court are not bound by decisions of the court that failed to address conflicting Supreme Court decisions. *Supra* at 74-75 (citing *Tann*, 577 F.3d at 542 (subsequent circuit panel not bound by prior decision of circuit that did not address contrary Supreme Court authority)). I thus proceed in this case on the basis that suppression is a last resort rather than the usual remedy.

I find the stare decisis question more difficult with respect to the more specific question whether to read the Supreme Court's decision in *Davis* narrowly to apply only where the individual police officer's conclusion that a search is lawful rests on squarely controlling authority, as opposed to more broadly when the officer's conclusion is objectively reasonable based on current law. In adopting a narrow interpretation of *Davis*, this court explicitly discussed *Davis*. *See United States v.*

*Debruhl*, 38 A.3d 293, 297 (D.C. 2012). As I previously noted, *supra* at 72-76, I believe that, at least barring unusual circumstances, I am bound by the holdings of decisions of this court interpreting *Davis*, even if in my view those decisions incorrectly interpreted *Davis*.

Although I have doubts about the correctness of the court's ruling in *Debruhl*, I need not decide whether those doubts rise to the level of "unusual circumstances" that would justify departing from *Debruhl* and instead following a different understanding of the Supreme Court's decision in *Davis*. I say that for two reasons. First, as the opinion for the court in this case points out, *ante* at 34, the United States in this case has not clearly pushed for a broad holding that suppression is unjustified whenever an individual police officer acted with an objectively reasonable belief that a search was lawful. Moreover, we do not need to decide that precise question in this case, because we here confront a somewhat different question: whether suppression is warranted when a law-enforcement agency not engaged in the competitive activity of ferreting out crime conducts a search in the objectively reasonable belief that the search was lawful. I do not understand this court's prior cases to require me to answer that question differently from the way I answer the question under the Supreme Court's binding authority.

For the foregoing reasons, I would hold that the trial court erred in suppressing the evidence at issue in this case. I respectfully dissent from the contrary holding of the court.